Charles MITCHELL, et al.,

v.

Natalie Haas STEFFEN, in her official capacity as Commissioner, Minnesota Department of Human Services, petitioner.

No. C3–92–239.

Supreme Court of Minnesota.

Aug. 6, 1993.

Hubert H. Humphrey, III, Atty. Gen., Jacelyn F. Olson, Asst. Atty. Gen., St. Paul, for appellant.

Ann Cofell, Mid–Minnesota Legal Asst., St. Cloud, Paul Onkka, Southern Minnesota Regional Legal Service, Inc., Prior Lake, William C. Daniels, Jr., Mid–Minnesota Legal Assistance, Minneapolis, for respondents.

SIMONETT, Justice.

This is an appeal from a summary judgment granted plaintiff-respondents in a class action suit. Both the trial court and the court of appeals ruled that Minn.Stat. § 256D.065 (1992), which imposes a durational residency requirement for full general assistance-work readiness benefits, was

unconstitutional. *See Mitchell v. Steffen,* 487 N.W.2d 896 (Minn.App.1992). We granted the petition for further review of the Commissioner of the Minnesota Department of Human Services, and we now affirm.

Faced with a budget crisis for the 1992–93 biennium, the legislature enacted Minn. Stat. § 256D.065, effective July 1, 1991 (hereinafter referred to as the "1991 amendment"), which reduces general assistance grants available to certain welfare recipients during their first 6 months of residency in this state. The amendment reads:

> Notwithstanding any other provisions of sections 256D.01 to 256D.21, otherwise eligible applicants without minor children, *who have been residing in the state less than six months,* shall be granted general assistance and work readiness payments in an amount that * * * equal[s] 60 percent of the amount that the applicant would be eligible to receive under section 256D.06, subdivision 1. A person may receive benefits in excess of this amount, equal to the lesser of the benefits actually received in the last state of residence or the maximum benefits allowable under section 256D.06, subdivision 1.

(Emphasis added.)

Plaintiff-respondents are unmarried adults without children who had resided in Minnesota less than 6 months and had applied for general assistance benefits after July 1, 1991. They received the reduced benefits and filed a complaint under 42 U.S.C. § 1983, alleging that Minn.Stat. § 256D.065 violates their right to travel, as well as the equal protection clause of both the federal and state constitutions and the privileges and immunities clause of the federal constitution. The district court certified the action as a class action.

Welfare recipients who have resided in Minnesota for at least 6 months receive general assistance benefits of $203 a month for a single person and $260 per month for a married couple. Minn.Stat. §§ 256D.05, subd. 1a and 256D.06, subd. 1 (1990 & Supp.1991).[1] Under the 1991 amendment, recipients who have resided in this state less than 6 months receive only 60 percent of these amounts.

In other words, eligible adults without minor children who have resided in Minnesota for less than 6 months receive $122 per month (instead of $203) if a single person and $156 per month (instead of $260) if a married couple; however, if the applicant provides verification, that person receives either the amount received in the previous state or the $203 or $260 per month granted Minnesota residents, whichever is lesser. Thus Minnesota will match the welfare benefits granted in the recipient's prior state but only up to the maximum Minnesota grant. Many states, however, provide no general assistance-work readiness benefits to their indigent residents.

The trial court ruled that the 1991 amendment violated the respondents' fundamental right to travel and to equal protection of the laws under the United States Constitution, but did not reach the question of whether the Minnesota equal protection clause was violated. The trial court concluded that the primary purpose of the 1991 amendment was to deter indigents from coming to Minnesota, and that the law "burdens plaintiffs' right to travel because it uses a classification which penalizes the exercise of that right." The court enjoined further enforcement of the law but denied retroactive benefits.

The court of appeals agreed with the trial court that the 1991 amendment was unconstitutional. Because the right to travel was implicated by the 6–month residency requirement, the appeals court held

---

1. The 1991 amendment applies also to work readiness benefits. These benefits are paid for 6 months in a 12–month period (with a minor exception) to a recipient who complies with the training requirements of the work readiness program. Maximum work readiness benefits are also $203 a month for a single person and $260 a month for a married couple, and are reduced to 60 percent for recipients who have resided in this state for less than 6 months. *See* Minn.Stat. § 256D.051 (1990 & Supp.1991).

the classification thereby created was subject to strict scrutiny; and because the law failed this heightened standard, it was unconstitutional. In addition, the court of appeals went on to hold that the law also violated our state's equal protection clause. Finally the court of appeals reversed the trial court's denial of retroactive benefits and remanded to the trial court to fashion a remedy for members of the class.

We granted the commissioner's petition for further review, which raises only the constitutional issues of equal protection and right to travel. (Issues relating to the privileges and immunities clause and to retroactive benefits are not raised here.)

The first two issues, as set out in the appellant commissioner's brief, are (1) whether the 1991 amendment violates the constitutional right to travel, and (2) whether the amendment violates the federal equal protection clause. It seems to us the question is not so much whether the right to travel has been "violated," but whether the right to travel has been so burdened by the durational residency requirement of the 1991 amendment that the statute's classification requires strict scrutiny rather than minimal rational basis analysis. "In reality, right to travel analysis refers to little more than a particular application of equal protection analysis." *Zobel v. Williams,* 457 U.S. 55, 60 n. 6, 102 S.Ct. 2309, 2313 n. 6, 72 L.Ed.2d 672 (1981).

The right to travel is inherent in the concept of our country as a federal union; hence the right to travel is a fundamental constitutional right under the federal constitution. *United States v. Guest,* 383 U.S. 745, 758–60, 86 S.Ct. 1170, 1178–79, 16 L.Ed.2d 239 (1966). This right to travel, which includes the right to migrate, is delineated in a series of United States Supreme Court decisions, particularly *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); and *Attorney Gen. of N.Y. v. Soto–Lopez,* 476 U.S. 898, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986). The right to travel is implicated when a statute *actually deters* such travel,

when *impeding* travel is its primary objective, or when it uses any *classification* which serves to *penalize* the exercise of that right. *Soto–Lopez,* 476 U.S. at 903, 106 S.Ct. at 2320.

In this case, there is no evidence that the 1991 amendment actually deters migration or seeks to impede travel. Indigent newcomers to Minnesota are no worse off (and maybe better off) for welfare benefits in this state than they were in the state of their prior residency, so that the level of benefits under the 1991 amendment is not a deterrent to leaving the prior state. And while the purpose of the legislation was to conserve funds, it is clear from the statute itself that it was intended to save money without placing a deterrence on an indigent's decision to travel.

This lawsuit, then, is to be judged under the third type of situation, under those right-to-travel cases that have dealt "with state laws that, by classifying residents according to the time they established residence, resulted in the unequal distribution of rights and benefits among otherwise qualified bona fide residents." *Soto–Lopez,* 476 U.S. at 903, 106 S.Ct. at 2321.

*Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), is particularly pertinent. There a state statute denied welfare assistance to residents who had not resided in the state for at least 1 year. The statute created two classes of needy persons, one composed of residents residing in the state for over a year and the other of residents residing in the state for less than a year. "Since the classification here touches on the fundamental right of interstate movement, its constitutionality must be judged by the stricter standard of whether it promotes a *compelling* state interest." *Id.* at 638, 89 S.Ct. at 1333. The Court then held that the 1–year waiting period, which would cause indigents to hesitate to migrate to the state, failed to meet equal protection standards. While a state has a legitimate interest in preserving its fiscal integrity, the saving of welfare costs, said the Court, does not justify discriminating against newcomers.

A few years later, the United States Supreme Court decided *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). There an Arizona statute required a year's residence in a county as a condition for receiving non-emergency medical care at county expense. It was understood this statute covered interstate movement. The Court reasoned that medical care is as much a basic necessity of life to an indigent as welfare benefits; and, therefore, following *Shapiro*, the Court declared the statute unconstitutional. The Court held that the 1–year durational residency requirement for nonemergency free medical care created an "invidious classification" that impinged on the right to travel by denying newcomers the basic necessities of life and for which there was no compelling state interest. *Id.* at 269, 94 S.Ct. at 1088.

In several cases the United States Supreme Court has struck down state statutes with fixed point residency requirements. *See Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985) (state veterans preference limited to veterans who had been state residents on or prior to a certain date); *Attorney Gen. of N.Y. v. Soto–Lopez*, 476 U.S. 898, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (veterans preference limited to veterans who had entered military service when a state resident or had been residents prior to a certain date). *Cf. Zobel v. Williams*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (Alaskan statute distributing oil revenue payments to all residents with the amount of the payments varying with years of residency, held, invalid, failing to meet even the minimal rational basis test). In these three cases, interstate movement is less directly involved because the conferring of benefits is not dependent on a waiting period, but simply on the length of the residency.

Under the analysis applied in the United States Supreme Court's decisions, which we must follow, the 1991 amendment clearly implicates the right to travel. If a needy resident of Minnesota has resided here less than 6 months, he or she receives only 60 percent of the general assistance or work readiness benefits that other needy residents of Minnesota receive. These two classes are composed of equally needy welfare recipients, but members of the first class—solely because of a shorter residency—have their benefits reduced 40 percent.

Arguably the "right to travel" should focus on the interstate travel itself, not on what happens after the travel has ended. Within this context, it would seem that the decision to migrate is dependent upon a comparison of the benefits available in the state one proposes to leave with the benefits available in the state one proposes to go to. We understand the dissent in this case to take this position.

The United States Supreme Court, however, has extended the so-called "right to travel" to include what might better be called a "right to abide in any state," *i.e.*, a right to live and settle down anywhere one chooses in this country without being disadvantaged because of that choice. *See Dunn v. Blumstein*, 405 U.S. 330, 338, 92 S.Ct. 995, 1001, 31 L.Ed.2d 274 (1972). Inherent in making this choice is the exercise of the right to travel, or as it is sometimes and more precisely called, the right to migrate. Thus, it is said, a durational residency requirement involves an "indirect manner of burdening the right [to travel]." *Soto–Lopez*, 476 U.S. at 903, 106 S.Ct. at 2321.

In determining this "indirect" burdening of the right to travel, the United States Supreme Court has ruled that the comparison, in our case, is to be made between recent residents to Minnesota and other Minnesota residents, not between recent Minnesota residents and residents of other states. The Court has made this abundantly clear. In *Shapiro v. Thompson*, 394 U.S. 618, 631, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969), the Court said, "[A] State may no more try to fence out those indigents who seek higher welfare benefits than it may try to fence out indigents generally." Or as put in *Soto–Lopez*, the right to migrate "protects residents of a State from being disadvantaged, or from being treated differently, simply because of the

timing of their migration, from other similarly situated residents." *Soto–Lopez*, 476 U.S. at 904, 106 S.Ct. at 2322. Or *Hooper*, 472 U.S. 612, 623, 105 S.Ct. at 2868: "The State may not favor established residents over new residents based on the view that the State may take care of 'its own,' if such is defined by prior residence." [2]

Plainly, then, the 1991 amendment implicates the constitutional right to travel. Even if so, contends the appellant commissioner, the "60 percent benefits for 6 months" does not penalize the right to travel so as to trigger strict scrutiny. "Penalize," as used in this context, does not mean, however, to sanction or punish, but rather to suffer disadvantage, loss or hardship. *See Cole v. Housing Authority of City of Newport*, 435 F.2d 807, 811 (1970) (quoted approvingly in *Memorial Hospital* at footnote 10). The nature of the disadvantage or hardship is important. *See Shapiro*, 394 U.S. at 638 n. 21, 89 S.Ct. at 1333 n. 21 (durational residence requirements for a license to hunt or fish or to practice a profession may not constitute a penalty on the exercise of the right to travel); *Davis v. Davis*, 297 Minn. 187, 192, 210 N.W.2d 221, 225 (1973) (durational residency requirement for bringing a divorce action valid, observing "not every penalty in interstate travel triggers the compelling-state-interest test").

At stake in this case are payments for the basic necessities of life, just as in *Shapiro* and *Memorial Hospital*. Half a year is a long time to wait for full general assistance benefits. "[E]ven temporary deprivations of very important benefits and rights can operate to penalize migration." *Soto–Lopez*, 476 U.S. at 907, 106 S.Ct. at 2323. A divided Wisconsin Supreme Court upheld a durational residency requirement

for welfare benefits in certain instances, but the waiting period there was only 60 days. *Jones v. Milwaukee County*, 168 Wis.2d 892, 485 N.W.2d 21 (1992). Here, instead of receiving $203 or $260 a month, the newly arrived indigents receive $81 a month less if single and $104 a month less if a couple, a not insignificant amount, especially if a Minnesota winter is at hand.[3]

Nor is it necessary to show that the 6–month waiting period has actually stopped people from coming to Minnesota. "*Shapiro* did not rest upon a finding that denial of welfare actually deterred travel." *Dunn v. Blumstein*, 405 U.S. 330, 339, 92 S.Ct. 995, 1002, 31 L.Ed.2d 274 (1972). It is not to be expected individuals in other states, if deterred from migrating here, would come forward to say so. The test, rather, is whether it is reasonable to infer that needy individuals would be discouraged from migrating. *See Shapiro*, 394 U.S. at 629, 89 S.Ct. at 1328 ("An indigent who desires to migrate, resettle, find a new job, and start a new life will doubtless hesitate if he knows that he must risk making the move without the possibility of falling back on state welfare assistance * * *."); *Memorial Hospital*, 415 U.S. at 257, 94 S.Ct. at 1081 (An indigent "may hesitate if he knows that he must make the move without the possibility of falling back on the State for medical care.").

Finally, the fact that the 1991 amendment does provide at least reduced welfare benefits does not make the deprivation any less a "penalty" on travel. In *Memorial Hospital*, the fact that Arizona provided emergency medical care during the waiting period, while nonemergency medical care was denied, did not save the Arizona statute from being held unconstitutional.[4]

---

**2.** Under the dissent's view, the 1991 amendment creates two classes, one class consisting of indigents residing in Minnesota, and the other class consisting of indigents living in other states. Here the distinction between the classes is the *place* of residence, not the *duration* of residence.

But if the place of residence is the relevant distinction, it seems the equal protection problem largely dissipates. There are ample differences between states to justify different welfare benefits in different states.

**3.** The commissioner estimates that the 1991 amendment will save the state approximately $890,000 in fiscal year 1992, $1 million in 1993, $1.2 million in 1994, and $1 million in 1995.

**4.** Recently, we might add, a federal district court held California's AFDC program, patterned similarly to this state's 1991 amendment,

■ True, a state is not constitutionally required to provide welfare benefits in an adequate amount or in any amount. *Dandridge v. Williams*, 397 U.S. 471, 486–87, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). The equal protection clause is not an entitlement clause. Indeed, many states do not have a general assistance program, and recently Michigan canceled its entire general assistance-work readiness program. But when a state decides to provide welfare benefits, the constitutional right to travel, as interpreted by the United States Supreme Court, mandates that the state distribute these benefits equally to its needy residents who are similarly situated without distinguishing between its residents on the duration of their residency.[5]

■ We conclude, therefore, that the "60 percent benefits for 6 months" plan "penalizes" the fundamental constitutional right to migrate. Indeed, under the federal constitution as interpreted by the United States Supreme Court, we have no alternative. Only one step in our analysis then remains, namely, determining whether the state can show a compelling state interest for its durational residency requirement. The appellant commissioner claims the 1991 amendment serves a legitimate state interest, but, as the commissioner acknowledges, if there has been an impingement on the fundamental right to travel, the strict scrutiny standard governs, and the commissioner does not contend (nor could she) that the 1991 amendment meets a compelling state interest.

unconstitutional. *Green v. Anderson*, 811 F.Supp. 516 (E.D.Cal.1993). The California plan imposed a 1–year residency requirement on newly arrived residents but provided reduced benefits not to exceed what the family would have received in the state of prior residence during the 1–year waiting period. Following *Shapiro* and *Memorial Hospital*, the court held the plan unconstitutional.

5. The .assumption that nonresident indigents move to a new state because of higher welfare benefits is apparently unproven and in some doubt. There are many other factors to account for migrating to Minnesota, such as job opportunities, the presence of family and friends, etc. Then, too, the net impact of in-migration and out-migration has been estimated at about zero.

The purpose of the 1991 amendment was to conserve limited state funds, but *Shapiro* and *Memorial Hospital* flatly hold this is not a compelling reason. "The conservation of the taxpayers' purse," declares *Memorial Hospital*, 415 U.S. at 263, 94 S.Ct. at 1085, "is simply not a sufficient state interest to sustain a durational residence requirement which, in effect, severely penalizes exercise of the right to freely migrate and settle in another State."

The 1991 amendment is, therefore, unconstitutional under the equal protection clause of the United States Constitution. There is no need to consider whether the 1991 amendment violates our state equal protection clause, and we do not reach that issue.

Affirmed.

PAGE, Justice, took no part in the consideration or decision of this case.

TOMLJANOVICH, Justice (dissenting).

Because I would answer all three questions presented in the negative, I respectfully dissent and would hold that Minn. Stat. § 256D.065 (1992) is constitutional.

The right to travel is implicated when a statute actually deters travel, when impeding travel is its primary purpose, or when it uses any classification which serves to penalize the exercise of the right to travel. *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 903, 106 S.Ct. 2317, 2321, 90 L.Ed.2d 899 (1986).

*See Welfare Migration Study: A Report to the 1991 Legislature*, Dept. of Human Services (Feb. 1991) at 24–25.

It should be noted, too, that the general assistance-work readiness programs deal with those persons residing in the state. The problem of transients, *i.e.*, those who pass through the state just long enough to pick up a welfare check, is a different problem, and is handled by weekly grants or vouchers for food and shelter by a county. *Id.* As *Shapiro* makes clear, the state may require residency for receipt of benefits without impinging on the constitutional right to travel, but it may not require a waiting period before receipt of benefits. 394 U.S. at 637, 89 S.Ct. at 1333.

Although the respondents failed to show that they or any other people were actually deterred from migrating or traveling to Minnesota because of section 256D.065, the court of appeals assumed

> an indigent who desires to migrate to Minnesota may hesitate if he or she knows only 60 percent of the amount necessary to live in Minnesota will be available. This assumes, of course, that the $203 grant amount available to established Minnesota residents is the amount 'necessary to maintain a subsistence reasonably compatible with decency and health' in Minnesota.

*Mitchell v. Steffen*, 487 N.W.2d 896, 902 (citing the purpose of the general assistance statute at Minn.Stat. § 256D.01, subd. 1 (1990)). By this reasoning, if $203 is not sufficient to maintain this subsistence, the entire general assistance statute deters travel and would therefore be unconstitutional. It is a dubious assumption that $203 per month is sufficient to provide food, clothing, shelter and transportation in Minnesota. While I am very concerned about unfortunate people who must rely on this meager amount, a statute is not unconstitutional simply because it is under-funded to fulfill its purposes. Furthermore, the state does not have a legal duty to provide welfare benefits. This is not a case where the state is granting "basic subsistence to one class of needy residents while denying it to an equally needy class of residents." *Starns v. Malkerson*, 326 F.Supp. 234, 238 (Minn.1970), *aff'd*, 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971), (quoting *Kirk v. Board of Regents*, 273 Cal.App.2d 430, 440, 78 Cal Rptr. 260, 266–67 (1969), *appeal dismissed*, 396 U.S. 554, 90 S.Ct. 754, 24 L.Ed.2d 747 (1970)).

The respondents have failed to show that the intent of the statute is to deter travel. I do not agree that the intent of the legislature was to deter the transient population from coming into the State for benefits, nor to punish the decision of indigents to migrate to Minnesota. Had this been the purpose, the legislature could have enacted legislation to provide vouchers for shelter and other needs in lieu of cash grants, or

eliminated the entire general assistance/work readiness grant programs. Rather, the legislature chose to carefully craft the 1991 amendment so as to make the amount of welfare benefits a neutral factor in a person's decision to migrate to Minnesota. Although it does not totally remove the incentive for all persons, "if the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' " *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911). As we noted in another case, the legislature is granted

> 'the exercise of a wide scope of discretion * * *.'
>
> \*     \*     \*     \*     \*     \*
>
> [i]f any reasonable distinction between the subjects * * * can be found, the legislative classification should be sustained.

*Anderson v. City of St. Paul*, 226 Minn. 186, 194–95, 32 N.W.2d 538, 543 (1948) (quoting *Whitney v. California*, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927)).

We further noted that

> [I]t is not permissible for the courts to inquire into the motives * * * in enacting the ordinance for the purpose of assailing its validity. The motives * * * are wholly immaterial.

*Id.* at 226 Minn. at 204, 32 N.W.2d at 548.

Finally, I conclude that a person is never punished for exercising their right to travel by section 256D.065 since an eligible person receives at least as much, if not more, than he or she received in his or her previous state of residence, unless that amount exceeds the statutory maximum. A single person would receive less only if they migrated from a state where they received more than $203, the statutory maximum for residents of longer duration in Minnesota. If a single person migrated from a state where they received less than $122 per month, or no grant at all, he or she is actually rewarded for exercising his or her

right to travel by receiving a grant of $122 per month for six months in Minnesota.[1]

The named representatives of the class illustrate this fact. Two each received $122 per month in Minnesota, although they had received nothing at all in their previous state of residence. The other two named representatives received the same amount in Minnesota that they received in their last state of residence. Clearly, of these four respondents, none were penalized and two were rewarded under section 256D.065 for exercising their right to travel to Minnesota.

Although the United States Supreme Court found that a 1–year residency requirement prior to receiving non-emergency care infringed upon the right to travel and was therefore unconstitutional in *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), that case is distinguishable. Unlike *Memorial Hospital*, the respondents do not have to wait one year before receiving any benefits under section 256D.065; grants, albeit at a reduced level, are received immediately if the person is eligible. The court stated that medical care is a basic necessity of life that could not be denied to newcomers in *Memorial Hospital;* although food and shelter are also basic necessities, the Supreme Court has never imposed a duty upon the states to provide a standard of living for its residents, nor established a right for anyone to receive welfare assistance. *See, Lavine v. Milne*, 424 U.S. 577, 584 n. 9, 96 S.Ct. 1010, 1015 n. 9, 47 L.Ed.2d 249 (1976) (citing *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)).

There is language in some United States Supreme Court cases which might be read to dictate that the right to travel is implicated whenever a state treats a new resident differently than longer term residents.

[T]he right of interstate travel must be seen as insuring new residents the same right to vital government benefits and privileges in the States to which they migrate as are enjoyed by other residents.

*Memorial Hospital*, 415 U.S. at 261, 94 S.Ct. at 1084. This statement seems to suggest that the right to travel can be implicated not only if a migrant is treated less favorably in the new state of residence than in the previous state of residence, but also if, within the new state, the newcomer is treated less favorably than other residents. In another case the Court says

the right to migrate protects residents of a State from being disadvantaged, or from being treated differently, simply because of the timing of their migration, from other similarly situated residents.

*Soto–Lopez*, 476 U.S. at 904, 106 S.Ct. at 2322.[2]

And then again the Court said

[t]he State may not favor established residents over new residents based on the view that the State may take care of 'its own,' if such is defined by prior residence.

*Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 623, 105 S.Ct. 2862, 2868, 86 L.Ed.2d 487 (1985).

The use of this language has blurred the distinction between equal protection and the right to travel. However, these are separate challenges which must be analyzed on their own merits. I do not believe that the Court intends to conclude that the right to travel is implicated every time an equal protection challenge is presented. *See, e.g., Zobel v. Williams*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982). This would open a floodgate of appeals requiring strict scrutiny. Surely the Court does not intend to re-enter the *Lochner* era.[3]

1. Many states provide general assistance at an amount less than Minnesota, and many states provide no general assistance whatsoever.

2. But in note 5 the same court says that not all waiting periods are constitutionally impermissible.

3. *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) lends its name to a period of time for which the Supreme Court has been severely criticized for conducting substantive due process review to invalidate laws that did not involve personal liberties.

The right to travel is not implicated by this 1991 amendment because there has been no showing of actual deterrence or that the legislative intent in enacting the 1991 amendment was to deter travel. When determining whether a person is penalized for exercising their right to travel, the appropriate focus is not whether the person is treated differently than longer term residents, but whether the benefits the person is eligible for are less than those received, if any, in their last state of residence. I doubt a person contemplating migration would study the classifications in a state statutory scheme and then "hesitate" to migrate. A person might look at the resources presently available and compare them to what will be available after migration: If he or she would have the same or more resources than at the present, no hesitation would be induced by the 1991 amendment. Unlike the "hesitation" in *Shapiro* and *Memorial Hospital,* newly arrived indigents do have the possibility of "falling back on state welfare assistance."

This is not, as the majority claims, a comparison of indigents newly arrived in Minnesota with indigents in other states, or an attempt to evaluate the cost of living in various states as the California court seems to require in *Green v. Anderson,* 811 F.Supp. 516 (E.D.Calif.1993). It merely looks at the status of an indigent person's economic resources immediately before and after the move to Minnesota to determine if that person has been penalized by the 1991 amendment for exercising their right to travel. If an indigent has the same grant both before and after their move to Minnesota, the loss, disadvantage or hardship suffered, if any, is due to the higher cost of living in Minnesota, not because her or his grant level is temporarily lower than that available to longer term residents.

Even if the exercise of the right to travel were implicated, "[N]ot every penalty on interstate travel triggers the compelling-state-interest test." *See Davis v. Davis,* 297 Minn. 187, 192, 210 N.W.2d 221, 225 (1973); *see also Soto–Lopez,* 476 U.S. at 905, n. 5, 106 S.Ct. at 2322, n. 5. In *Davis*

we held that a 1–year residency requirement before divorce proceedings was constitutional. *Davis, supra,* at 227. *See also Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). In another case, a statute with a 1–year residency requirement for resident tuition at a state university was upheld. *Starns,* 326 F.Supp. 234; *see also Vlandis v. Kline,* 412 U.S. 441, 452, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63 (1973); *Sturgis v. Washington,* 368 F.Supp. 38 (W.D.Wash.1973), *aff'd,* 414 U.S. 1057, 94 S.Ct. 563, 38 L.Ed.2d 464 (1973).

Discussing *Shapiro,* the court in *Memorial Hospital* said that "any durational residence requirement impinges to some extent on the right to travel" but that "[t]he amount of impact required to give rise to the compelling-state-interest test was not made clear." *Memorial Hospital* 415 U.S. at 256–57, 94 S.Ct. at 1081. The Court said the factors to consider were whether the waiting period deters migration and the extent to which the residence requirement penalized the right to travel. *Id.* at 257, 94 S.Ct. at 1080. Since there is neither deterrence nor penalty by the 1991 amendment, strict scrutiny is not required even if it "impinges to some extent on the right to travel."

The cases in which the Court has overturned statutes on right to travel grounds have either involved waiting periods for longer than 6 months or a complete denial of benefits, usually for 1 year. *See Shapiro, supra; Memorial Hospital, supra.* The 1991 amendment is not that harsh. The residency requirement is for only six months and benefits are not withheld if applicants are otherwise eligible.

The other cases in which the Court has struck down statutes on right to travel grounds involve situations where the classifications created are permanent and the treatment of the classes never equalizes. *See Zobel, supra; Soto–Lopez, supra.* Our legislature has not created this type of permanently unequal system in which new residents will never "catch up" with longer term residents; benefits equalize after 6 months.

Since the respondents have failed to prove that the 1991 amendment implicates the right to travel by any of the means indicated in *Soto–Lopez*, strict scrutiny is not appropriate. Minn.Stat. § 256D.065 need only be rationally related to a legitimate government purpose to survive constitutional review. *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 618, 105 S.Ct. 2862, 2866, 86 L.Ed.2d 487 (1985); *New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 172, 92 S.Ct. 1400, 1405, 31 L.Ed.2d 768 (1972).

The state has a legitimate purpose to be fiscally responsible and to conserve limited funds. The projected savings of $890,000 in the first fiscal year, and $1 million or more in successive years is directly and rationally related to this purpose. The legislature could have terminated the entire general assistance/work readiness programs, as Michigan has recently done, but instead chose to preserve these grants and maximize the limited welfare resources available. Similarly, we upheld a statutory scheme under which $100 in "gate-pay" was made available to prisoners upon their release from prison, unless they had more than $100 set aside from their work earnings. *Thomale v. Schoen*, 309 Minn. 285, 244 N.W.2d 51 (1976). We reasoned that the legislature ensured a "greater gratuity than it would have otherwise been able to give if it had provided a flat payment to all parolees regardless of the amount accumulated in their funds." *Id.*, 309 Minn. at 288, 244 N.W.2d at 53.

Since I conclude that Minn.Stat. § 256D.065 does not implicate the right to travel and survives constitutional scrutiny, I must consider the remaining two questions presented.

The Equal Protection Clause contained in the Fourteenth Amendment of the United States Constitution provides that persons similarly situated be treated alike unless a rational basis exists for discriminating among them. However, the state is not required to treat all citizens identically, rather

> [the state] must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill.

*Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982).

Here the respondents' claim does not involve either a suspect classification, as identified by the United States Supreme Court, nor does it implicate a fundamental right.[4] The standard of review to be used when measuring classifications created by a public welfare benefit statute against an equal protection claim was established in *Jefferson v. Hackney*, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), and *Dandridge*, 397 U.S. 471, 90 S.Ct. 1153. In *Jefferson*, the United States Supreme Court used the minimum scrutiny of the rational basis test when it upheld a Texas statute which established a percentage reduction factor to be applied to apportion available welfare benefits among various recipients. *Jefferson*, 406 U.S. at 546, 92 S.Ct. at 1731.

The rational basis analysis is the same as that used in my determination that the right to travel is not implicated. The state has a legitimate purpose in being fiscally responsible, and 256D.065 is rationally related to that purpose.

This is not like the statute in *Zobel v. Williams, supra.* In *Zobel*, the United States Supreme Court held that the creation of a fund to pay dividends from oil reserves in different amounts depending on length of residence was unconstitutional on equal protection grounds. *Id.* 457 U.S. at 65, 102 S.Ct. at 2315. In *Zobel*, the classifications were permanent and the dividends were derived from a natural resource and

---

**4.** The United States Supreme Court has consistently held that there is no constitutional right to welfare benefits, and that states have wide latitude in setting welfare benefits. *Dandridge*, 397 U.S. at 480, 90 S.Ct. at 1159; *Lavine*, 424 U.S. at 584, n. 9, 96 S.Ct. at 1015, n. 9.

were a continuing, permanent entitlement, guaranteed by constitutional amendment. *Id.* at 56–57, 102 S.Ct. at 2310–11. On the contrary, these general assistance/work readiness benefits involved are not a constitutional right and the classification involved is only temporary.

I am aware of two other states which have considered the constitutionality of somewhat similar statutes. In *Opinion of the Justice to the House of Representatives*, 357 Mass. 827, 257 N.E.2d 94 (1970), the Supreme Judicial Court of Massachusetts gave its opinion on a bill pending before the Massachusetts House of Representatives which would have limited welfare benefits for 2 years to the amount the new resident had received in the state of the person's last domicile. *Id.* 257 N.E.2d at 94. The court concluded that if the sole purpose of the proposed bill was to deter the migration of indigent people, it would violate the Equal Protection Clause of the United States Constitution. *Id.* at 95.

In *Jones v. Milwaukee County*, 168 Wis.2d 892, 485 N.W.2d 21, 22 (Wis.1992), the statute involved required persons to be residents of the state for at least 60 consecutive days before they would be eligible for any welfare relief.[5] The Wisconsin Supreme Court found it to be constitutional under both the state and federal constitutions. *Id.* 485 N.W.2d at 22. The court relied upon *Dandridge*, which held that the state could place a ceiling on welfare benefits to encourage employment and avoid discrimination between welfare families and families of the working poor. *Id.* at 27.

Minn.Stat. § 256D.065 falls between these two examples. The 6–month residency requirement is far less than the 2 years proposed in Massachusetts, but more than the 60 days involved in the Wisconsin statute. However, in Wisconsin, all aid is withheld for 60 days, whereas in Minnesota reduced benefits are granted during the 6 months.

I conclude the statute passes the minimal scrutiny of the federal rational basis test

and therefore does not violate the Equal Protection Clause of the United States Constitution. In doing so I agree with the *Dandridge* Court, which wrote:

> We do not decide today that the * * * regulation is wise, that it best fulfills the relevant social and economic objectives * * *, or that a more just and humane system could not be devised. * * * But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards * * *. But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients.

*Dandridge*, 397 U.S. at 487, 90 S.Ct. at 1162.

Plaintiff-respondents further assert, and the court of appeals agreed, that the six-month residency requirement for full general assistance benefits violates the Equal Protection Clause of the Minnesota Constitution. The court of appeals was of the view that our recent case, *State v. Russell*, 477 N.W.2d 886, 888–89 (Minn.1991), created an equal protection standard "which is different and more stringent than its federal counterpart," and that, under this *Russell* standard, the 1991 amendment must be found unconstitutional. *Mitchell*, 487 N.W.2d at 904.

Our case law on state equal protection analysis has not always been characterized by doctrinal constancy, and this case seems an appropriate occasion to review briefly and to clarify that analysis. Our equal protection "clause" is an un-enumerated but inherent constitutional right, found and confirmed in Minn. Const. art. 1, § 16 and included in art. 1, § 2. *Russell*, 477 N.W.2d at 893 (Simonett, J., concurring). Under this equality guaranty, "persons similarly situated are to be treated alike unless a sufficient basis exists for distinguishing among them." *Id.*

---

5. Several exceptions were provided for by the statute. *Id.* 485 N.W.2d at 23–24.

As the concurring opinion in *Russell* points out, over the years our state equal protection approach has at times been intertwined with our constitutional prohibition against special legislation (art. 12, § 1), our state provision for uniformity in taxation (art. 10, § 1), and the federal equal protection analysis. *Id.* at 893–94. *See, for example, Miller Brewing Co. v. State,* 284 N.W.2d 353, 356 (Minn.1979). *Miller* cites *Montgomery Ward Co. v. Comm'r of Taxation,* 216 Minn. 307, 12 N.W.2d 625 (1943), which relies on the federal rational basis test, but then also cites *Schwartz v. Talmo,* 295 Minn. 356, 205 N.W.2d 318 (1973), appeal dismissed, 414 U.S. 803, 94 S.Ct. 130, 38 L.Ed.2d 39 (1973) for what has come to be called the "three part test." *Miller, supra* at 356. *See* footnote 5, *infra.* This "three part test" can be traced back to *Loew v. Hagerle Brothers,* 226 Minn. 485, 33 N.W.2d 598 (1948), and even beyond; interestingly, *Loew* was really a special legislation challenge, not an equal protection case. It is this "three part test," at times slightly reworded, which appears eventually in *Russell.* Consequently, it is not surprising that the question has been raised whether the state's "rational basis" test is more strict than the federal rational basis test. *See, e.g.,* McKnight, *Minnesota Rational Relation Test: The Lochner Monster in the 10,000 Lakes,* 10 Wm.Mitchell L.Rev. 709 (1984); *Haskell's, Inc. v. Sopsic,* 313 N.W.2d 921 (1981).

In 1983 we attempted to clarify our equal protection test in *AFSCME Councils 6, 14, 65 and 96 v. Sundquist,* 338 N.W.2d 560 (Minn.1983). There we upheld the constitutionality of legislation requiring state employees to make additional payments into a pension fund. The case lent itself to the federal rational basis test. We also upheld the legislation, however, under our state equal protection guaranty and stated:

> We therefore reiterate that the prohibitions against arbitrary legislative action embodied in the state equal protection clause * * * are coextensive with those afforded by the federal equal protection clause.

*Id.* at 570 n. 12. We added:

> We have recognized that the standard applied to claims brought under the state equal protection clause * * * is **the same as that applied to claims brought under the federal equal protection clause.**

*Id.* at 569 n. 11 (emphasis added). Yet, notwithstanding *Sundquist,* we again raised, but did not answer, the question whether our state rational basis test was more strict than the federal test in *Bernthal v. City of St. Paul,* 376 N.W.2d 422, 424–25 (Minn.1985).

This brings us, then, to *State v. Russell, supra,* where this court applied the "three part test," [6] stating it was "our stricter standard of rational basis review," and then held unconstitutional a statute that would have survived the federal rational basis test. *Russell,* 477 N.W.2d at 889. The particular facts of *Russell,* however, must be kept in mind. There the state criminal statute made both possession of three or more grams of crack cocaine and possession of ten or more grams of cocaine powder the same third degree offense. The statute was found to have a disparate impact upon African–Americans because crack cocaine was used primarily by blacks while cocaine powder was used primarily by whites. Although the statute was neutral on its face and there was no evidence of any discriminatory purpose, we held that the disparate impact on a suspect class required more than minimal rational basis

---

**6.** The "three part test" as given in *Russell* is: (1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*State v. Russell,* 477 N.W.2d 886, 888 (Minn. 1991), (quoting *Wegan v. Village of Lexington,* 309 N.W.2d 273, 280 (Minn.1981), which, in turn, quotes *Guilliams v. Comm'r of Revenue,* 299 N.W.2d 138, 142 (Minn.1980))).

scrutiny. The irony of the statute, we noted, was that "the challenged classification appears to impose a substantially disproportionate burden on the very class of persons whose history inspired the principles of equal protection." *Id.* at 889. As Justice Simonett's concurrence pointed out, the court's analysis was something less than federal "strict scrutiny" and something more than federal "rational basis"; and that this mid-level equal protection scrutiny was appropriate "to preserve a proper regard for the civil liberties of this state's people while at the same time according the legislative branch the deference which the separation of powers doctrine requires." *Id.* at 894.

Equal protection methodology is designed in large part to expand or contract the degree of deference to be accorded the legislative judgment when it creates classes treating persons within and without the class differently. For this purpose, federal equal protection analysis has three "levels" of scrutiny: First is the level of least deference called strict scrutiny for cases implicating fundamental rights or involving suspect classes, where there must be a necessary relation to a compelling government interest and the legislation must be narrowly drawn. *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). Next is a mid-level of intermediate scrutiny for cases involving semi-suspect classes, where there must be shown a substantial relationship to an important government interest. *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Finally, there is the minimal scrutiny of the rational basis test for all remaining classes, where all that is required is a rational relation to a legitimate government interest. *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

What emerges, I think, from our cases and what best reconciles them, is an analysis which places the *Russell* three part test within the mid-level of scrutiny. In *Russell,* the facial neutrality of the statute was compromised by the substantial, although inadvertent, disparate impact on a particular racial group; this special situation fits best within an intermediate or mid-level degree of scrutiny. Consequently, I would adopt the following analytical framework for our state constitution's equal protection analysis. First, strict scrutiny requiring a necessary relation to a compelling state interest should apply when a fundamental right is implicated or if the legislation involves a suspect class. Next, mid-level scrutiny should apply for semi-suspect classes and for legislation which is neutral on its face but which has a disparate impact upon a suspect class. The test for mid-level scrutiny should be the *Russell* "three part" test. *See* footnote 5, *infra.* Finally, for remaining classifications, the minimal scrutiny of the rational basis test should apply, requiring a rational or reasonable relation to achieving a legitimate state interest. *See AFSCME,* 338 N.W.2d at 569.

The "three part test" should be reserved for mid-level scrutiny. A separate minimal level of scrutiny would remain, measured by the traditional rational basis analysis. Actually, this approach has been implicit in the equal protection cases we have decided since *Russell,* where we have declined to apply the three part *Russell* test and have instead used minimal rational basis scrutiny. *See Clabo v. Bor–Son Constr. Co.,* 481 N.W.2d 47, 48 (Minn.1992) (use of construction industry weekly wage to determine benefits); *Peterson v. Stafford,* 490 N.W.2d 418, 423 (Minn.1992) (challenge to statutory ballot form and designation of incumbency). *See also John Hancock Mutual Life Ins. Co. v. Comm'r of Revenue,* 497 N.W.2d 250 (Minn.1993) (federal rational basis test used to determine constitutionality of income tax treatment of insurance premium).

I turn now to this case. The statute involved is economic legislation, concerning the allocation of the state's financial resources to a social welfare program. No fundamental right is implicated nor is a suspect class or semi-suspect class involved. Consequently, I apply the rational

basis test. The legislation will not be set aside if any set of facts may reasonably be conceived to justify the classification. *See, e.g., AFSCME, supra; Thomale,* 309 Minn. at 288, 244 N.W.2d at 53. Here the state has a legitimate purpose in safeguarding its financial integrity: The classification on the basis of residency with adjusted benefit levels is rationally related to that purpose. I would hold that Minn.Stat. § 256D.065 (1992) does not violate the equal protection guaranty of our state constitution.

COYNE, Justice (concurring specially).

Because I have concluded, albeit reluctantly, that the United States Supreme Court has ruled that any statute which bases different treatment on a fixed point residency requirement constitutes an unconstitutional implication of the right to travel and because I recognize that we are bound by the Supreme Court's determination, I concur in the result reached by the majority. It does seem to me, however, that fixed point residency requirements can have any one of three effects upon the right to travel. The operation of the statute may burden the right to travel or it may provide an incentive to travel or it may simply be neutral with respect to the right to travel. I consider the Minnesota statute strictly neutral as it impinges upon the right to travel because a resident newly arrived in Minnesota will be eligible for general assistance in an amount not less than that person was receiving in the state from which he or she had emigrated up to the amount of general assistance to which the most senior Minnesota resident is entitled. At a time when most states are struggling to remain solvent, I can see no earthly reason for limiting a state's option to the total discontinuance of general assistance or of risking financial ruin.