Deshawn GREEN, Debby Venturella, and Diana P. Bertollt, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Eloise ANDERSON, California Department of Social Services, Thomas Hayes, Defendants.

No. Civ. S–92–2118.

United States District Court, E.D. California.

Jan. 28, 1993.

Sarah Elizabeth Kurtz, Peter H. Reid, Hope G. Nakamura, San Mateo County Legal Aid Society, Redwood City, CA, Mark D. Rosenbaum, Silvia R. Argueta, ACLU Foundation of Southern California, Los Angeles, CA, Grace A. Galligher, Coalition of

California Welfare Rights Organizations, Sacramento, CA, Jeffrey R. Williams, Morgenstein and Jubelirer, Judith E. Kurtz, Equal Rights Advocates, San Francisco, CA, for plaintiffs.

Dennis Eckhart, Theodore Garelis, California State Attys. Gen., Mary L. Grad, Asst. U.S. Atty., Sacramento, CA, for defendants.

## MEMORANDUM OF DECISION AND ORDER

LEVI, District Judge.

Plaintiffs are California residents who have moved or relocated to the State of California within the past twelve months and seek welfare benefits under the Aid to Families with Dependent Children ("AFDC") program.[1] California recently enacted a durational residency requirement of one year for full AFDC benefits; until the applicant for AFDC has resided in the State for twelve consecutive months, the applicant's level of benefits may not exceed what the family would have received in the state of prior residence. Cal.Welf. & Inst. Code § 11450.03 (West Supp.1992).[2] The residency requirement became effective upon approval by the United States Secretary of Health and Human Services. The Secretary gave approval on October 29, 1992,[3] and the California Department of Social Services began applying the residency limitation shortly thereafter.

Plaintiff Deshawn Green was a Sacramento resident for twelve years and then moved to Louisiana in 1985. She had two children in Louisiana. In December 1992, Green decided to move back to California where her mother lives. The full monthly California AFDC grant for a family of three is $624; under the two tier system for the next twelve months Green will receive $190 a month which is what she would have received in Louisiana. Plaintiff Debby Venturella came to California in December 1992. She has one child and is pregnant. She had been living in Oklahoma for six weeks when she decided to move to California where her parents live. She was not receiving AFDC benefits in Oklahoma. Under the two tier system, after her child is born, Venturella will be limited to AFDC benefits of $341, which is the Oklahoma level for a family of three. Finally, plaintiff Diana Bertollt moved to California from Colorado to be with relatives. She has one child and will be limited to $280 a month—the Colorado benefit—as opposed to the full California amount of $504 for two family members.

All three plaintiffs allege that they moved to California to escape abusive family circumstances. Green Decl., ¶ 3; Venturella Decl., ¶ 12; Bertollt Decl., ¶ 2. There is no dispute that all three plaintiffs are bona fide residents of the State of California, and the State acknowledges that plaintiffs are entitled to AFDC benefits—albeit at the reduced level—as California residents. *See* Defs.' Opp'n, 19:14–15; Cal.

---

1. AFDC is a cooperative federalism program created by the Social Security Act of 1935. 42 U.S.C. §§ 601–609 (1982). AFDC benefits are financed jointly by the federal government and the states. The program is administered by the states under a plan approved by the Secretary of Health and Human Services. 42 U.S.C. § 601 (1982). Subject to certain limitations in federal law, the states have the power to set the standard of need and level of benefits. *King v. Smith*, 392 U.S. 309, 334, 88 S.Ct. 2128, 2142, 20 L.Ed.2d 1118 (1968); *Largo v. Sunn*, 835 F.2d 205, 208 (9th Cir.1987).

2. Section 11450.03 of the Welfare and Institutions Code provides:

   Notwithstanding the maximum aid payments specified in paragraph (1) of subdivision (a) of Section 11450, families that have resided in this state for less than 12 months shall be paid an amount calculated in accordance with paragraph (1) of subdivision (a) of Section 11450, not to exceed the maximum aid payment that would have been received by that family from the state of prior residence.

3. The Secretary gave approval in the form of a waiver. *See* Pls.' Ex. 2. The waiver also approves a 1.3% reduction in benefits and permits the State to further reduce AFDC benefits to all recipients by up to 5%.

   Because the validity of the Secretary's waiver is called into question by this lawsuit, on January 4, 1993, the court requested the United States to file an amicus brief in support of the Secretary's action. By letter dated January 21, 1993, the day before its brief was to be filed, the United States declined to file an amicus brief and made no request for additional time.

Welf. & Inst.Code § 17100 (West 1991). By separate order the court will provisionally certify this matter as a class action.[4]

The State of California budget allocates nearly $6 billion for AFDC benefits in 1992–93. The California Department of Finance estimates that the durational residency requirement at issue here will save the State $8.4 million in the 1992–93 fiscal year and $22.5 million in the 1993–94 fiscal year. Hordyk Decl., ¶ 5.[5]

Plaintiffs now move for a preliminary injunction blocking application of the durational residency requirement in section 11450.03(a) of the California Welfare and Institutions Code. A temporary restraining order was issued December 22, 1992 by the Honorable Milton L. Schwarz and remains in effect by stipulation.

## I.

The State's two tier system for AFDC benefits implicates the constitutional right to freedom of travel or migration. The right to migrate from one state to another "occupies a position fundamental to the concept of our Federal union" and "has long been recognized as a basic right under the Constitution." *United States v. Guest*, 383 U.S. 745, 757–58, 86 S.Ct. 1170, 1177–78, 16 L.Ed.2d 239 (1966). Although the right to travel is not protected by explicit provision in the Constitution, as it was in the Articles of Confederation,[6] the Supreme Court repeatedly has held that such a right inheres in the concept of a union. *See, e.g. id.; Zobel v. Williams*, 457 U.S. 55, 67, 102 S.Ct. 2309, 2316, 72 L.Ed.2d 672 ("I find its unmistakable essence in that document that transformed a loose confederation of States into one Nation") (Brennan, J., concurring).[7]

The right of migration protects not only physical movement, and forbids direct restraints on interstate migration,[8] but also "protects residents of a State from being disadvantaged, or from being treated differently, simply because of the timing of their migration, from other similarly situated residents." *Attorney General of New York v. Soto–Lopez*, 476 U.S. 898, 905, 106 S.Ct. 2317, 2322, 90 L.Ed.2d 899 (1986). It is this equal treatment aspect of the right to migration—rather than the prohibition on direct barriers to movement—that has been most important in the more recent cases. The Court consistently has rejected state preferences for longer term residents, even when motivated by an altruistic desire to do more for the state's "own:"

The State may not favor established residents over new residents based on the

---

**4.** Plaintiffs have requested a provisional order certifying that this proceeding be maintained as a class action consisting of "all present and future AFDC applicants and recipients who have applied or will apply for AFDC on or after December 1, 1992, and who will be denied full California AFDC benefits because they have not resided in California for twelve consecutive months immediately preceding their application for aid." Defendants have filed a notice of non-opposition to the motion for provisional class certification.

An April 1990 study by the State Department of Social Services found that 6.6% of the State's existing AFDC caseload resided in another state within the year before applying for benefits in California. Healy Decl., ¶ 5.

**5.** Since California's fiscal year begins in July, the 1992–93 figures represent only a partial year's savings.

**6.** Article IV of the Articles of Confederation provided that "the people of each State shall have free ingress and regress to and from any other State."

**7.** Different provisions of the constitution have been relied upon as the textual source of the right to migrate, including the Privileges and Immunities Clause of Art. IV, see *Zobel v. Williams*, 457 U.S. 55, 71, 102 S.Ct. 2309, 2318, 72 L.Ed.2d 672 (1982) (O'Connor, J., concurring), the Privileges and Immunities Clause of the Fourteenth Amendment, see *Edwards v. California*, 314 U.S. 160, 177–78, 62 S.Ct. 164, 168–69, 86 L.Ed. 119 (1941) (Douglas, J., concurring), the Commerce Clause, see *Edwards*, 314 U.S. at 173–74, 62 S.Ct. at 166–67, and the Equal Protection Clause of the Fourteenth Amendment, see *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 618 n. 6, 105 S.Ct. 2862, 2866 n. 6, 86 L.Ed.2d 487 (1985).

**8.** *See The Passenger Cases*, 48 U.S. (7 How.), 283, 12 L.Ed. 702 (1849) (invalidating tax on passengers from foreign ports); *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 18 L.Ed. 745 (1867) (invalidating tax on persons leaving the state); *Edwards v. California*, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941) (invalidating state law making it a crime to bring into the state a non-resident knowing that the non-resident is indigent).

view that the State may take care of 'its own,' if such is defined by prior residence. Newcomers, by establishing bona fide residence in the State, become the State's 'own' and may not be discriminated against solely on the basis of their arrival in the State after [a fixed date]. *Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 623, 105 S.Ct. 2862, 2868, 86 L.Ed.2d 487 (1985).

Because of this right to equal treatment without regard to the length of residency, the Court has almost invariably found that durational residency requirements are unconstitutional. Such residency requirements distinguish not between bona fide residents and non-residents but between residents based on the length of their residency in the state.

In *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the Court found unconstitutional provisions denying welfare assistance to residents who had not resided for at least one year within the jurisdiction. Such provisions discriminate invidiously by "creat[ing] two classes of needy resident families indistinguishable from each other except that one is composed of residents who have resided a year or more, and the second of residents who have resided less than a year, in the jurisdiction." *Id.* at 627, 89 S.Ct. at 1327. The Court rejected the justification that such a waiting period would deter migration of poor people into the state; such a justification was directly at odds with the constitutional right of migration. *Id.* at 629, 89 S.Ct. at 1328. Nor was it relevant whether those migrating to the state in fact were seeking higher assistance payments or came for other reasons; the Court found that a State had no more right to deter those from settling in search of greater welfare assistance than it would to deter those seeking better educational opportunities. *Id.* at 631–32, 89 S.Ct. at 1329–30. The Court also rejected any justification of the measure based on past tax contributions; this "reasoning would logically permit the State to bar new residents from schools, parks, and libraries or deprive them of police and fire protection." Such an apportionment of state services would

violate equal protection. *Id.* at 632, 89 S.Ct. at 1330. Finally, the Court held that the states' legitimate concern for its fiscal integrity could not justify discrimination against new residents for the "saving of welfare costs cannot justify an otherwise invidious classification." *Id.* at 633, 89 S.Ct. at 1330.

In *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), the Court followed *Shapiro* and invalidated an Arizona provision requiring a year's residence in a county as a condition of receiving nonemergency medical care at county expense. The Court framed the issue as whether the state's classification "penalized" persons who had recently migrated to the state. *Id.* at 256–57, 94 S.Ct. at 1081–82. If there were such a penalty the provision would be unconstitutional unless supported by a compelling state interest. *Id.* at 262–63, 94 S.Ct. at 1084–85. The Court found that just as the denial of the necessities of life in *Shapiro* operated to penalize recent migrants so did the denial of nonemergency medical care. The Court rejected the State's argument that since some medical services—indeed, emergency services—were provided without waiting, the denial of nonemergency medical services could be distinguished from the complete denial as in *Shapiro*. *Id.* at 259–61, 94 S.Ct. at 1082–83. Nor was the State's interest in protecting its financial stability of sufficient strength to justify the discrimination against newcomers:

> The conservation of the taxpayers' purse is simply not a sufficient state interest to sustain a durational residence requirement which, in effect severely penalizes exercise of the right to freely migrate and settle in another State.

*Id.* at 263, 94 S.Ct. at 1085. Similarly, in *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), decided before *Memorial Hospital,* the Court invalidated a durational residency provision requiring one-year's residence before a new resident could vote.

On only one occasion has the Court upheld a durational residency requirement.[9] In *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), the Court upheld the State's one year residency requirement for petitioners seeking a divorce decree when the respondent is not a state resident. In distinguishing *Shapiro, Dunn,* and *Memorial Hospital,* the Court noted that the State's interest in regulating domestic relations and protecting its divorce decrees from collateral attack was materially greater than the budgetary and recordkeeping interests advanced in the prior cases.[10] Alternatively, the case may be understood to find the interest in a speedy divorce of insufficient magnitude to amount to a penalty on migration.

In three more recent cases, the Court has expanded the equality principle in *Shapiro* to invalidate state provisions that distinguish between residents on the basis of length of residency without incorporating a durational residency requirement. These cases more clearly have less to do with constraints on migration and travel than with the unconstitutionality of distinctions between residents based on how long they have lived in the state.

In *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982), the Court invalidated an Alaska statute providing payments from oil revenues to all residents where the size of the payment was determined by years of residency. The Court found that such a measure could not even survive the minimum rationality test. The Court warned that an approach that divided residents by years of residency threatened inequality over a large field:

> If the states can make the amount of a cash dividend depend on length of residence, what would preclude varying university tuition on a sliding scale based on years of residence—or even limiting access to finite public facilities, eligibility for student loans, for civil service jobs, or for government contracts by length of domicile? Could states impose different taxes based on length of residence? Alaska's reasoning could open the door to state apportionment of other rights, benefits, and services according to length of residency. It would permit the states to divide citizens into expanding numbers of permanent classes. Such a result would be clearly impermissible.

*Id.* at 64, 102 S.Ct. at 2314–15. Similarly, in *Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985), and *Attorney General of New York v. Soto–Lopez,* 476 U.S. 898, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986), the Court invalidated state veterans preferences limited to veterans who had been state residents prior to a certain date or who had entered the military when a state resident. In *Hooper* the State provided a tax exemption for Vietnam veterans residing in the State prior to May 8, 1976. In *Soto–Lopez* the state provided a veterans preference for civil service hiring limited to veterans who entered the military when a State resident. In both cases, using different approaches, the Court found that the equal protection clause will not countenance distinctions

---

**9.** In two summary rulings the Court has upheld one year durational residency requirements for resident tuition at state universities. *See Starns v. Malkerson,* 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971), summarily aff'g 326 F.Supp. 234 (Minn.1970) (three-judge court); *Sturgis v. Washington,* 414 U.S. 1057, 94 S.Ct. 563, 38 L.Ed.2d 464 (1973), summarily aff'g 368 F.Supp. 38 (W.D.Wash) (three-judge court). Because of their summary nature, these precedents are of diminished importance. *Zobel v. Williams,* 457 U.S. 55, 64 n. 13, 102 S.Ct. 2309, 2315 n. 13, 72 L.Ed.2d 672 (1982). Moreover, the Court consistently has viewed tuition residency requirements less as durational than as determining the bona fide residence of transient students. *See id.; Vlandis v. Kline,* 412 U.S. 441, 452–53 and n. 9, 93 S.Ct. 2230, 2236–37 and n. 9, 37

L.Ed.2d 63 (1973). In *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 260 n. 15, 94 S.Ct. 1076, 1083 n. 15, 39 L.Ed.2d 306 (1974), the Court suggests that a waiting period for free higher education is not a penalty on migration because such an interest is of less significance than welfare or medical care.

**10.** Referring to *Shapiro, Dunn,* and *Memorial Hospital,* the Court stated: "What those cases had in common was that the durational residency requirements they struck down were justified on the basis of budgetary or recordkeeping considerations which were held insufficient to outweigh the constitutional claims of the individuals." *Sosna,* 419 U.S. at 406, 95 S.Ct. at 561.

based on length or incipiency of residency. *Hooper*, 472 U.S. at 623, 105 S.Ct. at 2868–69; *Soto–Lopez*, 476 U.S. at 911, 106 S.Ct. at 2325.[11]

## II.

■ In light of cases discussed above, the durational residency requirement in § 11450.03 of the Welfare and Institutions Code must be invalid. Like *Shapiro*, the measure limits welfare and the basic necessities of life. As such it places a penalty on the decision of new residents to migrate to the State and be treated on an equal basis with existing residents. Although the measure does not eliminate all AFDC benefits, it produces substantial disparities in benefit levels and makes no accommodation for the different costs of living that exist in different states. In *Memorial Hospital* the measure was not saved because it pertained to some but not all medical services, so, too, this measure is not constitutional because it materially diminishes, without entirely eliminating, AFDC benefits.

Defendants suggest that the measure is not a penalty because the benefits provided are the same as those provided in the state of prior residence.[12] But under the cases the relevant comparison is not between recent residents of the State of California and residents of other states. Were this the comparison, the result in *Zobel* would be inexplicable since no other state provided a bounty to its citizens and thus Alaska treated new residents better in this respect than residents of other states. Similarly, it was of no significance in *Memorial Hospital* that the nonemergency care provided by Maricopa County may have been much superior to the medical care provided elsewhere. It is because the measure treats recent residents of California different than other *California* residents, and involves the basic necessities of life, that it places a penalty on migration. Moreover, the measure cannot fairly be said to provide the same payment as new residents could have received in the state of their prior residence since the cost of living, particularly housing, varies so substantially from state to state and generally is much higher in California than elsewhere.[13]

■ Because § 11450.03 places a penalty on migration, the defendants must show that the statute furthers a compelling state purpose. The interests advanced do not rise to that level.

If the purpose of the measure is to deter migration by poor people into the State, and it appears that this may be the pur-

**11.** Defendants seek to distinguish *Zobel, Hooper* and *Soto–Lopez* because the statutes at issue in those cases created fixed, permanent distinctions between residents based on when they arrived in the state. *Soto–Lopez*, 476 U.S. at 909, 106 S.Ct. at 2324; *Hooper*, 472 U.S. at 617, 105 S.Ct. at 2865–66; *Zobel*, 457 U.S. at 59, 102 S.Ct. at 2312. Because the effect of § 11450.03 is temporary, defendants argue it has a less significant impact on migration. However, the residency requirements invalidated in *Shapiro, Dunn* and *Memorial Hospital* were, by definition, temporary. Indeed, in *Soto–Lopez* the Court recognized, "[i]n previous cases, we have held that even temporary deprivations of very important benefits and rights can operate to penalize migration." *Id.* 476 U.S. at 907, 106 S.Ct. at 2323. Moreover, the distinctions drawn in *Zobel* were no more fixed than here; in both situations as residents gain seniority they are granted greater benefits. In one sense the distinctions drawn in *Zobel* are more elaborate than here. Under § 11450.03, after one year new residents are treated like everyone else. On the other hand, unlike the Alaska scheme, new California residents do not simply receive the same reduced payment but are further divided by state of prior residence.

**12.** Defendants also argue that § 11450.03 has not actually deterred the migration of any of the named plaintiffs. However, lack of evidence in the record of actual deterrence is of no significance if the statute creates a classification which serves to penalize migration. *Memorial Hospital*, 415 U.S. at 257–58, 94 S.Ct. at 1081–82; *Dunn*, 405 U.S. at 340–41, 92 S.Ct. at 1002–03; *Shapiro*, 394 U.S. at 634, 89 S.Ct. at 1330.

**13.** According to the table of Fair Market Rents established by the U.S. Department of Housing and Urban Development, California's housing costs are higher than any other state except Massachusetts. *See* Greenstein Decl. at 10. According to plaintiffs, in all but one of the forty-six states (including the District of Columbia) where AFDC benefits are lower than in California, housing costs are also lower. Thus, under § 11450.03, new California residents migrating from 45 of these 46 states will face higher costs of living with no increase in their benefits. *Id.*, ¶ 18.

pose,[14] then the measure must be unconstitutional. *Soto–Lopez,* 476 U.S. at 904, 106 S.Ct. at 2321; *Zobel,* 457 U.S. at 62 n. 9, 102 S.Ct. at 2314 n. 9; *Memorial Hospital,* 415 U.S. at 263–64, 94 S.Ct. at 1084–85; *Shapiro,* 394 U.S. at 629, 89 S.Ct. at 1328. But even if the purpose is only to conserve limited State funds in the hope that the State may do more for those who now and in the past have depended on the State, such a purpose, if laudable is yet unconstitutional. For as the Court has stated more than once, the State may not identify a group of current residents as its "own" and seek to advance their interests and address their needs to the detriment of new residents. *Soto–Lopez,* 476 U.S. at 911, 106 S.Ct. at 2325; *Hooper,* 472 U.S. at 623, 105 S.Ct. at 2868–69; *Zobel,* 457 U.S. at 65, 102 S.Ct. at 2315; *Shapiro,* 394 U.S. at 632–33, 89 S.Ct. at 1330. The Supreme Court has never upheld a durational residency requirement whose sole justification was the State's desire to conserve its resources. If this durational residency requirement were valid, then so would a measure limiting new residents to the same level of medical, educational, police, and fire services they received in the state of prior residence. If the one year requirement were valid because of cost savings, then so would a two year or longer requirement, or a graduated scale as in *Zobel.* Such a division among residents, all of whom are in fact bona fide residents of the State, violates equal protection.

Finally, even if the measure were viewed not as a penalty but as similar to the bounty in *Zobel,* it would still be impermissible under the analysis in *Zobel.* If the measure intends to deter settlement into the state of persons who need welfare and seek a higher benefit, it is sensibly designed but has an unconstitutional purpose. If the measure simply seeks to save costs, defendants fail to explain why new residents are better able to bear a reduction in benefits than other residents. For the measure applies to those who were on welfare in the state of prior residence and those who were not, those who need welfare when they arrive in California and those who come to that need months thereafter. It applies without regard to the cost of living in the state of prior residence or whether the applicant had access to other resources in the state of prior residence. Stripped of

---

**14.** There is evidence in the record to support the conclusion that the purpose of § 11450.03 was to deter migration of indigents. First, on March 9, 1992, the California State Assembly adopted Senate Bill ("SB") 366, a legislative proposal which contained language nearly identical to that contained in § 11450.03 (the sole substantive difference was the use of "could" in SB 366 instead of "would"). Assembly member Costa was the principal Assembly author of that measure. During the debate on the Assembly floor, Mr. Costa stated:

> Realizing that in fact funds are short in California today, it makes a great deal of sense then to insure that incentives are provided for people from other parts of the country ... that might be lured to California ... for that purpose—to benefit from higher assistance. This legislation attempts to take care of that by requiring a one year residency requirement in California....

Pls.' Ex. 11, 15:17–26. The provisions of SB 366 were reflected in the Assembly's Budget Bill, Assembly Bill ("AB") 2303, and eventually enacted by the legislature in SB 485. McKeever Decl., ¶ 12. The legislative history of predecessor bills is relevant to discerning the legislative intent of a later enactment. *See Estate of Co-*

*wart v. Nicklos Drilling Co.,* —— U.S. ——, ——, 112 S.Ct. 2589, 2595, 120 L.Ed.2d 379 (1992).

Second, after § 11450.03 was enacted, the State renewed its waiver request to the United States Department of Health and Human Services. In a letter dated September 17, 1992, the State described the durational residency requirement enacted by the legislature as follows: "This proposal reduces the incentive for families to migrate to California for the purpose of obtaining higher aid payments." Pls.' Ex. 12 at 3. And, in the brief opposing the temporary restraining order, defendants list among the bases for implementation of the statute: "to prevent California from being a magnet for people seeking to increase the level of their public assistance benefits by moving to California." Def. Opp'n to TRO, December 21, 1992, 3:16–19. The government's current interpretation of a statute is entitled to less deference when in conflict with its initial position. *Cf. Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981).

Finally, such a purpose is inherent in a two-tier benefit structure. Because § 11450.03 does not save money by cutting all recipients' benefits equally, but instead affects only the benefits of new residents, its very structure suggests a goal of deterrence.

the unconstitutional purpose of deterring migration, the measure lacks a rational design. This group of residents is no better able to bear the loss of benefits than a group randomly drawn. The State may seek to conserve resources by reducing welfare benefits to all recipients or to some recipients on some rational, non-discriminatory basis. But unless the purpose here is to deter migration, there is no other rational basis for the distinction drawn among applicants all of whom are California residents.

The court recognizes that the measure at issue here passed easily into law. And California is not alone in seeking to limit the welfare benefits of new residents. New York has adopted a different schedule of benefits for new residents; Wisconsin and Minnesota[15] also have received federal approval to implement such measures. Genest Decl., ¶ 2,3. According to defendants, other states may be considering a similar kind of limitation. *Id.* Nonetheless, the Supreme Court of the United States, in what is now a large body of law, has made clear that the constitutionally based rights to migration and equal treatment do not permit significant distinctions between new and old residents based on the duration or incipiency of their residency. Therefore the State may not deny certain of its residents full welfare benefits simply because of the recency of their residency.

In short, under *Shapiro* and *Memorial Hospital,* the court finds that the two tier benefit schedule in § 11450.03 penalizes new residents because of the recency of their migration to the State. The State's interest in reducing welfare costs is not sufficient to justify the disparate treatment of this class of needy residents.

### III.

Plaintiffs demonstrate that they face the possibility of irreparable injury if the injunction is not issued.[16] All of plaintiffs have been unable to locate housing in California that is affordable to them on the reduced AFDC payment. *See* Green Decl., ¶ 6,7; Venturella Decl., ¶ 21; Bertollt Decl., ¶ 23.

Plaintiffs' motion for preliminary injunction is granted. The court orders:

(1) Pending judgment in this action, defendants and their agents, assignees and successors in interest are enjoined from implementing a) California Welfare and Institutions Code § 11450.03, b) regulations promulgated pursuant to § 11450.03, including but not limited to M.P.P. E.A.S. § 89–402.4, c) All–County Letter ("ACL") 92–98 and All–County Information Notice ("ACIN") I–54–92 to the extent that the ACL or ACIN deny standard California AFDC benefits to members of the plaintiff class or determine an AFDC benefit in whole or in part by reference to the AFDC grant in any other state or territory;

(2) Within ten calendar days of the issuance of this order, the defendants shall issue an All–County Letter notifying the counties and county welfare directors of this order, and instruct them to stop implementation of the policy enjoined by this order. Defendants shall provide plaintiffs' counsel with a copy of this All–County Letter.

(3) Plaintiffs will be permitted to proceed in this matter without posting bond or any other security.

IT IS SO ORDERED.

---

**15.** In June of 1992, the Minnesota durational residency provision was declared unconstitutional by the Court of Appeals of Minnesota. *Mitchell v. Steffen,* 487 N.W.2d 896 (1992).

**16.** To obtain a preliminary injunction, a party must show either (1) likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor. These are not separate tests, but the "outer reaches of a single continuum." *Los Angeles Memorial Coliseum v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980).