713 A.2d 1056

DIANNA SANCHEZ, APPELLANT, v. DEPARTMENT
OF HUMAN SERVICES, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 27, 1998—Decided July 8, 1998.

14

Before Judges DREIER, PAUL G. LEVY and WECKER.

*Melville D. Miller, Jr.*, argued the cause for appellant (Legal Services of New Jersey, attorneys; *Mr. Miller, Harris David, Leighton Holness, Regan Almonor* and *Mary Acevedo*, on the brief).

*David B. Himelman* argued the cause for respondent (*Picco Herbert Kennedy*, attorneys; *Patrick D. Kennedy*, of counsel, *Mr. Himelman* and *Thomas J. Burns*, on the brief).

*David B. Himelman* argued the cause for respondent (*Picco Herbert Kennedy*, attorneys; *Patrick D. Kennedy*, of counsel, *Mr. Himelman* and *Thomas J. Burns*, on the brief).

The opinion of the court was delivered by

WECKER, J.A.D.

In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). 42 *U.S.C.A.* § 601 *et seq.* The PRWORA replaced the Aid to Families with Dependent Children program with the Temporary Assistance for Needy Families block grant program. The new federal legislation includes the following provision:

> A State operating a program funded under this part may apply to a family the rules (including benefit amounts) of the program funded under this part of another State if the family has moved to the State from the other State and has resided in the State for less than 12 months.
>
> [42 *U.S.C.A.* § 604(c).]

Pursuant to PRWORA, in 1997 the New Jersey Legislature passed the Work First New Jersey Program, *N.J.S.A.* 44:10–34 *et seq.* As part of the Work First New Jersey Program, the Legislature enacted *N.J.S.A.* 44:10–46:

> A recipient who has resided in New Jersey for less than 12 consecutive months shall be eligible to receive cash assistance benefits in the amount that the recipient would have received from the recipient's immediately prior state of residence if that amount is less than the cash assistance benefits provided by the program. This limitation on cash assistance benefits shall apply until the recipient has resided in New Jersey for 12 consecutive months.[1]

The statute thus creates a two-tier welfare system, whereby a person seeking welfare benefits who has moved to New Jersey from a state that offers a lower level of cash assistance will receive lower benefits during the first twelve months of residence in New Jersey than would a person who has lived in the state for twelve consecutive months. Because we conclude that such a system infringes upon a fundamental right guaranteed by the United States Constitution, the right to travel and to migrate, and because it violates the equal protection of the laws guaranteed both by the United States and the New Jersey Constitutions, we reverse the order of the Camden County Board of Social Services limiting plaintiff's benefits pursuant to the statute, and permanently enjoin defendant from applying that statute to plaintiff or others similarly situated.

Plaintiff, Dianna Sanchez, challenges the constitutionality of *N.J.S.A.* 44:10–46 on the grounds that it violates her fundamental constitutional right to travel and her right to equal protection under both the Fourteenth Amendment of the United States Constitution, *U.S. Const.* amend. XIV, § 1, and Article 1 of the New Jersey Constitution, *N.J. Const.* art. I, ¶ 1. Defendant con-

---

[1] *N.J.A.C.* 10:90–3.1(d), a regulation promulgated by defendant, includes nearly identical terms:

> [A] new eligible applicant/recipient who has resided in New Jersey for less than 12 consecutive months shall be eligible to receive cash assistance benefits in the amount that the recipient would have received from the recipient's prior state of residence if that amount is less than the cash assistance benefits provided under the WFNJ/TANF [Work First New Jersey/Temporary Assistance for Needy Families] program. This limitation on cash assistance benefits shall apply until the recipient has resided in New Jersey for 12 consecutive months.

The regulation adds two exceptions not found in the statute (see footnote 5 below) and not applicable to Sanchez.

tends that the statute neither penalizes the exercise of a fundamental constitutional right to travel, nor discriminates on the basis of a suspect classification, and does not require our strict scrutiny. Thus defendant denies that it must show a compelling state interest in the legislation, and argues that the statute meets the less stringent test defendant deems applicable to plaintiff's equal protection argument: a rational relationship between the legislation and a legitimate state interest. We agree with plaintiff that the statute burdens the fundamental right to travel and to migrate, and that it fails to serve any compelling state interest. We also agree that defendant has failed to show that the challenged statute bears even a rational relationship to any legitimate governmental interest.

Sanchez, who was born and raised in Camden, New Jersey, first qualified for AFDC benefits in 1991, when she had one child. She has lived in New York, New Jersey, and Puerto Rico with her growing family, and at variance times apparently has qualified for public assistance in each jurisdiction. Sanchez moved to New York State in October 1991, had a second child in 1992, and in November 1993 returned to Camden. At that time she qualified for AFDC benefits for herself and her two children. For several months in 1994, Sanchez lived with her children in New York; but in July 1994, upon returning to New Jersey, she once again qualified for AFDC benefits for herself and her children. A third child was born to Sanchez in Camden in September 1994, and with brief interruptions unrelated to the issues before us, she continued to receive AFDC benefits in New Jersey, until she again moved to New York. In June 1996, Sanchez delivered a fourth child and moved to Puerto Rico with the baby's father and her three older children. However, in December 1996 Sanchez returned to Camden with three of the children and again qualified for AFDC benefits. Those benefits were terminated in April 1997, because Sanchez had returned to Puerto Rico with her children.

In July 1997 Sanchez again returned to Camden with three of the children, one child having remained in Puerto Rico with his

father. Sanchez was living with the children in one room of her mother's overcrowded apartment when she reapplied to defendant for public assistance. Her application was addressed pursuant to the newly enacted Work First New Jersey Program. Sanchez was granted $204 per month in benefits, the amount she would have received as a resident of Puerto Rico to support a family of four, instead of the $488 per month for which she would have qualified had she remained in New Jersey during the previous twelve consecutive months. *See N.J.S.A.* 44:10–46; *N.J.A.C.* 10:90–3.1(d). She also was awarded $379 per month in food stamps for the family, as well as medical coverage.

The Camden County Board of Social Services rejected plaintiff's appeal from the initial determination of benefits. Plaintiff then filed this appeal, along with a motion for emergent relief. During the pendency of this appeal, the Board agreed to provide Sanchez with the full benefits to which she would be entitled but for the twelve-month residency requirement, and to forego any claim for reimbursement in the event her appeal is unsuccessful. We therefore need not address the parties' arguments with respect to plaintiff's application for emergent relief.

■ The "framework for our analysis" is set forth in *San Antonio School District v. Rodriguez*, 411 *U.S.* 1, 17, 93 *S.Ct.* 1278, 1288 36 *L. Ed.*2d 16, 33 (1973):

We must decide, first, whether the [challenged statute] operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny.... If not, the [statute] must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

An analysis of plaintiff's constitutional argument with respect to the right to travel must begin with *Shapiro v. Thompson*, 394 *U.S.* 618, 89 *S.Ct.* 1322, 22 *L. Ed.*2d 600 (1969).

This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement. That

proposition was early stated by Chief Justice Taney in the Passenger Cases, [*Smith v. Turner*] 7 *How.* 283, 492, 12 *L. Ed.* 702, 790 (1849):

> For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States.

We have no occasion to ascribe the source of this right to travel interstate to a particular constitutional provision. It suffices that, as Mr. Justice Stewart said for the Court in *United States v. Guest*, 383 *U.S.* 745, 757–758, 86 *S.Ct.* 1170, 16 *L. Ed.*2d 239, 249 (1966):

> The constitutional right to travel from one State to another ... occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized.
>
> ... [The] right finds no explicit mention in the Constitution. The reason, it has been suggested, is that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created. In any event, freedom to travel throughout the United States has long been recognized as a basic right under the Constitution.

[*Id.* at 629–31, 89 *S.Ct.* at 1329, 22 *L. Ed.*2d at 612–13 (footnote omitted).]

In *Shapiro*, the Court held unconstitutional three statutes that denied *all* welfare benefits to applicants who had not lived within the jurisdiction for one year immediately preceding an application for cash assistance. *Id.* at 638, 89 *S.Ct.* at 1333, 22 *L. Ed.*2d at 617. The durational residency requirement essentially "create[d] two classes of needy resident families indistinguishable from each other except that one is composed of residents who have resided a year or more, and the second of residents who have resided less than a year, in the jurisdiction." *Id.* at 627, 89 *S.Ct.* at 1327, 22 *L. Ed.*2d at 611. The Court determined that the classification penalized individuals who exercised the right to travel between states by depriving them of welfare benefits. *Id.* at 634, 89 *S.Ct.* at 1331, 22 *L. Ed.*2d at 615.

> Since the classification here touches on the fundamental right of interstate movement, its constitutionality must be judged by the stricter standard of whether it promotes a *compelling* state interest. Under this standard, the waiting-period requirement clearly violates the Equal Protection Clause.

[*Id.* at 638, 89 *S.Ct.* at 1333, 22 *L. Ed.*2d at 617 (footnote omitted).]

Applying the strict scrutiny standard, the Court rejected several asserted justifications for the waiting period. The Court declared constitutionally impermissible the purpose to inhibit migration of

needy individuals into the State, because it directly infringed their right to interstate travel. *Id.* at 629, 89 *S.Ct.* at 1329, 22 *L. Ed.*2d at 612. Justice Brennan wrote for the majority in *Shapiro:*

[A] State may no more try to fence out those indigents who seek higher welfare benefits than it may try to fence out indigents generally. Implicit in any such distinction is the notion that indigents who enter a State with the hope of securing higher welfare benefits are somehow less deserving than indigents who do not take this consideration into account.

[*Id.* at 631–32, 89 *S.Ct.* at 1330, 22 *L. Ed.*2d at 613.]

The Court similarly rejected the states' contentions that they were entitled to distinguish between recent and long-term residents on the basis of their previous tax contributions, or simply to save money and preserve the state treasury. *Id.* at 632–33, 89 *S.Ct.* at 1330, 22 *L. Ed.*2d at 614. Recognizing the legitimate interest of the states in limiting expenses, the Court nonetheless held that preserving public funds is not a compelling state interest, and "a State may not accomplish such a purpose by invidious distinctions between classes of its citizens." *Id.* at 633, 89 *S.Ct.* at 1330, 22 *L. Ed.*2d at 614.

*Shapiro* did not declare all durational residency requirements unconstitutional *per se,* but only those with significant impact on the right to travel or migrate from state to state. *See Memorial Hospital v. Maricopa County,* 415 *U.S.* 250, 256, 94 *S.Ct.* 1076, 1081, 39 *L. Ed.*2d 306, 314 (1974). In *Memorial Hospital,* the Court held:

The Arizona durational residence requirement for eligibility for nonemergency free medical care creates an 'invidious classification' that impinges on the right of interstate travel by denying newcomers 'basic necessities of life.' Such a classification can only be sustained on a showing of a compelling state interest. Appellees have not met their heavy burden of justification, or demonstrated that the State, in pursuing legitimate objectives, has chosen means which do not unnecessarily impinge on constitutionally protected interests.

[*Id.* at 269, 94 *S.Ct.* at 1088, 39 *L. Ed.*2d at 321.]

The Court categorically rejected Arizona's argument that the fiscal integrity of its free medical care system was a compelling state interest sufficient to justify the discrimination against new residents. *Id.* at 263, 94 *S.Ct.* at 1085, 39 *L. Ed.*2d at 318. To the extent that the classification was designed to deter the in-migra-

tion of indigents, the Court held that goal unconstitutional. *Id.* at 263–64, 94 *S.Ct.* at 1085, 39 *L. Ed.*2d at 318. In finding the statute deterred such migration, the Court explained that it was unnecessary to show that anyone was actually deterred by the statute. *Id.* at 257–58, 94 *S.Ct.* at 1082, 39 *L. Ed.*2d at 314. *See also Dunn v. Blumstein,* 405 *U.S.* 330, 339–40, 92 *S.Ct.* 995, 1001–02, 31 *L. Ed.*2d 274, 283 (1972) (noting that in "right to travel" cases, the Supreme Court has not relied on proof of actual deterrence).

In *Attorney General of New York v. Soto–Lopez,* 476 *U.S.* 898, 901–03, 106 *S.Ct.* 2317, 2320–21, 90 *L. Ed.*2d 899, 904–05 (1986), the Court explicitly addressed the right to migrate as part of the overall right to travel:

> " '[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution.' " *Dunn v. Blumstein,* 405 *U.S.* 330, 338, 92 *S.Ct.* 995, 31 *L. Ed.*2d 274 (1972) (quoting *United States v. Guest,* 383 *U.S.* 745, 758, 86 *S.Ct.* 1170, 16 *L. Ed.*2d 239 (1966)). And it is clear that the freedom to travel includes the " 'freedom to enter and abide in any State in the Union.' " *Dunn, supra,* at 338, 92 *S.Ct.* 995, 31 *L. Ed.*2d 274 (quoting [*Oregon v.*] *Mitchell,* [400 *U.S.* 112] 285, 91 S.Ct. 260, 27 *L. Ed.*2d 272 [(1970)]).
>
> The textual source of the constitutional right to travel, or, more precisely, the right of free interstate migration, though, has proved elusive. It has been variously assigned to the Privileges and Immunities Clause of Art. IV, to the Commerce Clause, and to the Privileges and Immunities Clause of the Fourteenth Amendment. The right has also been inferred from the federal structure of government adopted by our Constitution. However, in light of the unquestioned historic acceptance of the principle of free interstate migration, and of the important role that principle has played in transforming many States into a single Nation, we have not felt impelled to locate this right definitively in any particular constitutional provision. Whatever its origin, the right to migrate is firmly established and has been repeatedly recognized by our cases.
>
> [Other citations and footnote omitted.]

The Court then set forth the circumstances that would bring a statute within right-to-travel jurisprudence. A state law impinges on the right to travel, and therefore implicates the compelling-state-interest test, when it actually deters interstate travel, when impeding travel is its primary objective, or when it penalizes the exercise of that right. *See Soto–Lopez, supra,* 476 *U.S.* at 903, 106 *S.Ct.* at 2321, 90 *L. Ed.*2d at 905.

> Our right-to-migrate cases have principally involved the latter, indirect manner of burdening the right. More particularly, our recent cases have dealt with state laws

that, by classifying residents according to the time they established residence, resulted in the unequal distribution of rights and benefits among otherwise qualified bona fide residents.

[*Id.* at 903, 106 *S.Ct.* at 2321, 90 *L. Ed.*2d at 905–06 (footnote omitted).]

The only proof plaintiff presents in support of her claim that *N.J.S.A.* 44:10–46 actually was intended to discourage migration is a comment by defendant's spokesperson that "[w]e just didn't know what other states would do with their policies and *we were concerned that New Jersey could become a magnet state for people on welfare.*" (emphasis added). Although the inference is available, we need not conclude that the challenged New Jersey statute was designed to impede migration as its primary objective, nor that the statute actually deters migration. In light of the purposes set forth in *N.J.S.A.* 44:10–56, the quoted statement alone is insufficient to establish either that the primary purpose of the twelve-consecutive-month residency requirement is to impinge on the right to travel or that it actually deters travel or migration.

We accept on its face the list of objectives of the Work First New Jersey program set forth in *N.J.S.A.* 44:10–56b—h: to encourage work and the earning of income in order to benefit families and children; to provide temporary assistance to help working individuals "obtain and keep a job in order to be able to avoid cycling back onto public assistance;" to enlist the involvement of the private sector in welfare reform efforts; to ensure "[p]ersonal and family security and stability;" and to help children and teenagers "reap the benefits of the support and guidance of a family structure ..." Unlike the three statutes at issue in *Shapiro*, there is no "weighty evidence that exclusion from the jurisdiction of the poor who need or may need relief was the specific objective of these provisions." 394 *U.S.* at 628, 89 *S.Ct.* at 1328, 22 *L. Ed.*2d at 611.

However, by conditioning maximum cash assistance on the duration of the applicant's residency in New Jersey, the statute treats some newcomers to the state significantly differently than others, and indirectly burdens the right to migrate between states. In effect, *N.J.S.A.* 44:10–46 penalizes needy persons who move

into New Jersey from a state with lower welfare benefits by granting lower cash assistance to them than to similarly needy persons who either meet the residency test or move here from states with equal or greater benefits. The law also burdens migration from New Jersey to other states by discouraging or penalizing needy New Jersey residents who attempt to improve their situation by moving to a state with a lower cost of living and lower welfare benefits, only to face a discriminatory benefits rule should they return in need of aid.

Plaintiff's situation illustrates this effect of the statute. Before plaintiff moved to Puerto Rico from New Jersey, she received $488 in cash assistance for herself and three children. In an effort to be self-sufficient, plaintiff moved to Puerto Rico, but she soon discovered that affordable housing was as elusive there as in New Jersey. Some four-and-one-half months later, plaintiff returned to New Jersey, only to find upon application for cash assistance that her benefits were to be $204, a reduction of nearly 58%, simply because she had moved to Puerto Rico during the previous year. Plaintiff would thus receive $284 less under the challenged statute because she tried to improve her family's circumstances.

Although this twelve-month residency requirement does not entirely deprive plaintiff of the basic necessities of life, as did the invalidated statutes in *Shapiro*, *N.J.S.A.* 44:10–46 would leave plaintiff with significantly less funds than other poor parents receive for subsistence for a family of four.[2] Defendant claims

---

[2] We do not comment on the benefit level applicable to families who meet the twelve-month residency requirement, which is based upon the amount the Department of Human Services has established as "a benchmark," that is, the amount "needed to maintain a safe and decent life...." *N.J.A.C.* 10:82–1.1A. For a family of four, that amount was $1,127 per month as of January 1992, presumably to be met by in-kind benefits, such as food stamps and rent subsidies, combined with cash assistance. *Id.* The 1997 federal poverty guidelines for a family of four were set at $16,050 per year ($1,337 per month). 62 *F.R.* 10856, 10857. *See generally Dandridge v. Williams*, 397 *U.S.* 471, 90 *S.Ct.* 1153, 25 *L. Ed.*2d 491 (1970) (a state is not constitutionally required to provide welfare benefits in an adequate amount or in any amount).

that the statute does not penalize plaintiff because she is in the same situation she would be in if she were still living in Puerto Rico. In addition to its failure to address the cost-of-living differential, that argument is flawed because "in case after case, the Court has determined that the appropriate comparison is among recent residents ... and other residents [of the same state,] and not to residents of other states." *Roe v. Anderson,* 966 *F.Supp.* 977, 984 (E.D.Cal.1997), *aff'd,* 134 *F.*3d 1400 (9th Cir.1998) (footnote omitted).

Defendant's additional argument, that the statute actually benefits plaintiff because she is receiving more food stamps, medical assistance, and other supportive services than she would receive in Puerto Rico, is similarly misguided. Providing a reduced level of assistance, rather than no assistance at all, is no less a penalty or burden on migration than the total denial outlawed in *Shapiro.* *See Mitchell v. Steffen,* 504 *N.W.*2d 198, 202 (Minn.1993), *cert. denied,* 510 *U.S.* 1081, 114 *S.Ct.* 902, 127 *L. Ed.*2d 93 (1994) (noting that in *Memorial Hospital,* providing free emergency medical care during the waiting period for free non-emergent care did not save the Arizona statute's durational residency requirement.) Furthermore, "even temporary deprivations of very important benefits and rights can operate to penalize migration." *Soto–Lopez, supra,* 476 *U.S.* at 907, 106 *S.Ct.* at 2323, 90 *L. Ed.*2d at 908.

■ Because the two-tier benefits statute severely disadvantages persons who exercise their right to migrate, the strict scrutiny test applies. In order to pass constitutional muster under *Shapiro* and its progeny, defendant must demonstrate that the one-year residency requirement is necessary to fulfill a compelling state interest and must be narrowly tailored to adopt the least drastic means of advancing that interest. *Dunn, supra,* 405 *U.S.* at 343, 92 *S.Ct.* at 1003, 31 *L. Ed.*2d at 285. *N.J.S.A.* 44:10–46 cannot meet the test, because it does not serve any compelling state interest. We deem the New Jersey statute legally indistinguishable from those found wanting in *Shapiro.*

■ The State contends that the challenged statute is specifically authorized by Congress in PRWORA, 42 *U.S.C.* § 604(c). As Justice Brennan said in *Shapiro,* referring to a pre-PRWORA version of the Social Security Act of 1935, 42 *U.S.C.* § 602(b),

> [E]ven if we were to assume, arguendo, that Congress did approve the imposition of a one-year waiting period, it is the responsive *state* legislation which infringes constitutional rights. By itself § 402(b) has absolutely no restrictive effect. It is therefore not that statute but only the state requirements which pose the constitutional question.
>
> Finally, even if it could be argued that the constitutionality of § 402(b) is somehow at issue here, it follows from what we have said that the provision, insofar as it permits the one-year waiting-period requirement, would be unconstitutional. *Congress may not authorize the States to violate the Equal Protection Clause.*
>
> [394 *U.S.* at 641, 89 *S.Ct.* at 1335, 22 *L. Ed.*2d at 619 (emphasis added).]

*See also Roe v. Anderson, supra,* 966 *F.Supp.* at 984 (quoting *Shapiro, supra,* 394 *U.S.* at 641, 89 *S.Ct.* at 1335, 22 *L. Ed.*2d at 619) (PRWORA cannot rescue California's two-tier provision because "Congress may not authorize the States to violate the Equal Protection Clause.") The federal law cannot save an unconstitutional New Jersey statute.

■ When benefits are distributed unequally, the distinctions between citizens are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment, and where the distinguishing characteristic is not a suspect category, a law will pass such scrutiny if the distinction is rationally related to a legitimate state purpose. *Zobel v. Williams,* 457 *U.S.* 55, 60, 102 *S.Ct.* 2309, 2312–13, 72 *L. Ed.*2d 672, 677–78 (1982). (an oil dividend distribution plan favoring Alaskan residents based on length of in-state residency is not rationally related to the purpose of creating an incentive to live in Alaska and encourage management of its resources). *See also Hooper, supra,* 472 *U.S.* at 623, 105 *S.Ct.* at 2868, 86 *L. Ed.*2d at 496 (New Mexico statute, granting tax exemption to those Vietnam veterans who had resided in state prior to specified date, bore no rational relationship to a legitimate state purpose and therefore violated equal protection). *Cf. Jones v. Milwaukee County,* 168 *Wis.*2d 892, 485 *N.W.*2d 21 (1992) (60-day waiting period required to collect welfare benefits upheld on

the ground that it is rationally related to the statute's goal, to prevent fraud and establish bona-fide residency status). Thus the equal protection clause requires only that the statute bear a rational relationship to a legitimate governmental interest, and not the more stringent compelling state interest.

Even if strict scrutiny did not apply based upon the constitutional right to travel,[3] this statute could not meet the rational relationship test of legitimacy under the Equal Protection Clause.

> When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. *See, e.g., Lehnhausen v. Lake Shore Auto Parts Co.,* 410 *U.S.* 356, 93 *S.Ct.* 1001, 35 *L. Ed.*2d 351 (1973). Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude.
>
> [*City of New Orleans v. Dukes,* 427 *U.S.* 297, 303, 96 *S.Ct.* 2513, 2516–17, 49 *L. Ed.*2d 511, 516–17 (1976).]

Defendant contends that the two-tier structure of the cash benefits of Work First New Jersey need only bear a rational relationship to a legitimate state interest and that the challenged statute meets that test because it is a rational means of altering the cycle of welfare dependency by encouraging work and by promoting individual responsibility and family stability.[4] However

---

[3] Defendant suggests that federal right-to-travel jurisprudence is flawed, citing Todd Zubler, *The Right to Migrate and Welfare Reform: Time for Shapiro v. Thompson to Take a Hike,* 31 *Val. U.L.Rev.* 893 (1997) and Thomas R. McCoy, *Recent Equal Protection Decisions—Fundamental Right to Travel or "Newcomers" as a Suspect Class?,* 28 *Vand. L.Rev.* 987 (1975). Nevertheless, defendant admits that *Shapiro* remains the law of the land.

[4] The Attorney General issued a letter opinion on June 19, 1992, to the Assembly Senior Citizens and Social Services Committee, advising that the statute at issue here "could be subject to challenge on federal constitutional grounds...." We do not deem that opinion binding on defendant.

salutary the goals, we disagree that the statute is a rational means to reach them.

■ We recognize that "States have considerable latitude in allocating their [public assistance] resources...." *King v. Smith*, 392 *U.S.* 309, 318–19, 88 *S.Ct.* 2128, 2134, 20 *L. Ed.*2d 1118, 1126 (1968) ("[E]ach state is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program." (footnote omitted)). We have no doubt that encouraging employment, individual responsibility, and family stability are not only permissible but laudable state objectives. We are similarly without doubt that the two-tier statute bears no rational relationship to those goals. Although preservation of fiscal integrity is a valid state interest, a State may not accomplish that goal by establishing "invidious" distinctions between citizens. *Shapiro, supra*, 394 *U.S.* at 633, 89 *S.Ct.* at 1330, 22 *L. Ed.*2d at 614. *See also Memorial Hospital, supra*, 415 *U.S.* at 263, 94 *S.Ct.* at 1085, 39 *L. Ed.2d* at 318 ("The conservation of the taxpayers' purse is simply not a sufficient state interest to sustain a durational residence requirement which, in effect, severely penalizes exercise of the right to freely migrate and settle in another State."). Similarly, distinctions favoring established residents over newer residents, based on the belief that the "State may take care of 'its own,'" have been found unconstitutional. *See Hooper v. Bernalillo County Assessor*, 472 *U.S.* 612, 623, 105 *S.Ct.* 2862, 2868, 86 *L. Ed.*2d 487, 496 (1985).

Defendant argues in part that "this residency requirement is intended to ... encourage new residents to aggressively take part in the work readiness activities that are provided through the Work First New Jersey Act...." If the goal of the statute is to encourage new residents to work, it cannot be accomplished in an irrationally discriminatory manner. It has been suggested that more rational and non-discriminatory means of encouraging work readiness would be to limit benefits to all new residents, and not just to those moving here from states with lower benefit levels. *See Maldonado v. Houstoun*, 177 *F.R.D.* 311, 332 (E.D.Pa.1997)

28

(residency requirement was not rationally related to legitimate government purposes). Had Sanchez moved to New Jersey from one of the approximately seventeen states that pays higher benefits, she would have been eligible for the same cash benefits that a long-term New Jersey resident could receive. Moreover, had Sanchez moved from a foreign country, applied for benefits within sixty days, and qualified as an "eligible alien," *see N.J.S.A.* 44:10–48a and 44:10–57, the reduced benefits law would not have applied to her. *See N.J.A.C.* 10:90–3.1(d)2.[5] Defendant somewhat disingenuously argues that the benefits formula

> provide[s] what a new resident family needs in terms of sustenance and medical care through the food stamp and medical assistance programs, as well as supportive services like child care, transportation and reimbursement for work related expenses, which are not affected by new residence status, combined with a reduced cash assistance benefit, which serves to dissuade complacency with respect to the welfare benefits received [thereby providing] an incentive for the individual to participate in the work and education programs without affecting their need for basic necessities, like food and medical care.

In defense of the program, defendant stresses the unreduced, noncash benefits available to newer residents. Yet clearly the formula does not increase the non-cash benefits to compensate for reduced cash assistance to new residents. Moreover, defendant does not explain why "what a new resident family needs" is any less than what an "old" resident family needs. The irrationality of defendant's argument is apparent.

Defendant also argues that the statute is particularly logical because of the five-year lifetime limit on receipt of welfare benefits, *N.J.S.A.* 44:10–72. We fail to see the connection. Would defendant also argue that lower food stamps provided to new

---

[5] *N.J.A.C.* 10:90–3.1(d)2 sets forth an exception not found in the statute itself:

> The limitation on cash assistance with regard to the 12-month residency requirement in (d) above does not apply to newly arrived eligible aliens who arrived in the United States within the 60-day period prior to the date of application for WFNJ benefits.

Section 1 of the same regulation provides an exception "for individuals who have moved from their prior state of residence as a result of domestic violence."

residents would encourage them to learn to farm? Would defendant argue that reduced medical assistance would encourage new residents to take better care of themselves? Admitting that reducing cash benefits for new residents "is not rationally related to the primary objective of the [pre-Work First New Jersey Welfare Program], i.e., providing benefits," defendant suggests that "[p]roviding benefits to needy families is no longer the focus or objective of the welfare system. It is now merely a means to an end ... [,] to *move people out of the welfare system.*" Defendant thus contends that having changed the objective of the public assistance program, it is permissible to reduce benefits to persons like Sanchez because it will "encourage new residents to participate in work readiness activities...." We repeat, we can find no rational basis for assuming that reduced benefits will encourage new residents to work, or that new residents need such encouragement more than long-time residents.

Defendant also seeks to justify the residency requirement on the ground that unless a certain percentage of families receiving public assistance participate in work programs, New Jersey's federal block grant will be reduced under PRWORA. If preserving the block grant is the goal, this statutory discrimination is not rationally related. Indeed, new welfare recipients are far outnumbered by those who have lived in the state for more than twelve months, and motivating those in the latter group to work would be more likely to insure meeting the percentage goal set by federal law as a condition of the block grant. Defendant cannot show how treating new residents differently from others advances the goal. In addition, we find such a goal comes perilously close to the money-saving rationale disapproved in *Shapiro.* We suspect then, as plaintiff contends, "the two-tier statute could bear a rational relationship only to one governmental purpose, and that purpose is itself impermissible—the anti-magnet goal."

To describe a statutory classification as "invidious" is thus actually a conclusory term, signifying that the challenged discrimination has failed to meet either the strict scrutiny or rational

relationship test, whichever applies, and is therefore unconstitutional. *See, e.g., Cleburne v. Cleburne Living Center, Inc.,* 473 *U.S.* 432, 446, 105 *S.Ct.* 3249, 3258, 87 *L.Ed.*2d 313 (1985); *San Antonio Independent School District v. Rodriguez, supra,* 411 *U.S.* at 17, 93 *S.Ct.* at 1288, 36 *L. Ed.*2d at 33 (1973).

We reach the same conclusion under our own state constitution. Article 1, paragraph 1 of the New Jersey Constitution provides:

> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.
>
> [*N.J. Const.* art. I, ¶ 1.]

Although Article 1 does not include the words "equal protection," the clause "protect[s] against injustice and against the unequal treatment of those who should be treated alike." *Greenberg v. Kimmelman,* 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985). *See also Barone v. Department of Human Servs.,* 107 *N.J.* 355, 368, 526 *A.*2d 1055 (1987). To this extent, Article 1 safeguards the same values encompassed by federal equal protection jurisprudence. *Id.* Equal protection analysis under the New Jersey Constitution "employ[s] a balancing test . . . [and][i]n striking the balance, we . . . consider[ ] the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." *Greenberg, supra,* 99 *N.J.* at 567, 494 *A.*2d 294 (citations omitted). *See also Brown v. City of Newark,* 113 *N.J.* 565, 573–74, 552 *A.*2d 125 (1989). The nature of the right affected by the statute is a well-established, fundamental right to travel, recognized by New Jersey courts. *See Barone, supra,* 107 *N.J.* at 366 n. 3, 526 *A.*2d 1055. The impact is obvious, as is the lack of a logical nexus between the statute and any permissible governmental interest. Although the New Jersey approach and that of the Supreme Court frequently yield the same result, *Barone, supra,* 107 *N.J.* at 368, 526 *A.*2d 1055, the protection afforded by our State Constitution can be broader than that found under the federal Equal Protection Clause. *Doe v. Poritz,* 142

*N.J.* 1, 94, 662 *A.*2d 367 (1995); *Barone, supra,* 107 *N.J.* at 368, 526 *A.*2d 1055. We need not repeat our federal equal protection analysis to conclude that *N.J.S.A.* 44:10–46 violates both the federal and state constitutional guarantees of equal protection of the law.

Courts that have considered similar legislation in other states have almost uniformly reached the same conclusion we reach today. *See Westenfelder v. Ferguson,* 998 *F.Supp.* 146 (D.R.I. 1998) (twelve-month durational residency requirement for full cash benefits unconstitutionally infringes right to travel and violates equal protection); *Warrick v. Snider,* 2 *F.Supp.*2d 720 (W.D.Pa. 1997) (sixty-day durational residency requirement for cash assistance fails both strict scrutiny and rational relationship tests); *Brown v. Wing,* 170 *Misc.*2d 554, 649 *N.Y.S.*2d 988 (N.Y.Sup.Ct. 1996), *aff'd,* 241 *A.D.*2d 956, 663 *N.Y.S.*2d 1025 (1997) (six-month durational responsibility requirement unconstitutionally infringes upon right to migrate and violates state constitution); *Roe v. Anderson, supra* (one year durational residency requirement for full benefits unconstitutionally burdens the right to travel and violates equal protection); *Mitchell v. Steffen, supra* (six-month residency requirement for full benefits unconstitutionally burdens right to travel); *Aumick v. Bane,* 161 *Misc.*2d 271, 612 *N.Y.S.*2d 766 (N.Y.Sup.Ct.1994) (reduced cash benefits during first six months of residency held unconstitutional under both federal and state constitutions). *See also Green v. Anderson,* 811 *F.Supp.* 516 (E.D.Cal.1993), *aff'd,* 26 *F.*3d 95 (9th Cir.1994), *vacated as unripe sub nom, Anderson v. Green,* 513 *U.S.* 557, 115 *S.Ct.* 1059, 130 *L. Ed.*2d 1050 (1995). *But see Jones v. Milwaukee County, supra* (holding sixty-day residency requirement rationally related to permissible state interests).

Under all the circumstances, we also reject defendant's contention that plaintiff has failed to exhaust her administrative remedies, and that the matter should be remanded for a hearing with respect to her eligibility for benefits. Defendant determined that plaintiff was eligible for state benefits when it granted the

reduced cash assistance challenged here. The matter in dispute is limited to the constitutionality of the state statute conditioning the amount of cash benefits upon a durational residency requirement. "[W]hen, as in this matter, the only challenge to the Board's policy is based on constitutional grounds and no factual issues exist which require administrative determination, the doctrine of exhaustion is not applicable, and judicial intervention is justified." *Student Members of Playcrafters v. Teaneck Tp. Bd. of Ed.*, 177 *N.J.Super.* 66, 73, 424 *A.2d* 1192 (App.Div.), *aff'd*, 88 *N.J.* 74, 438 *A.2d* 543 (1981). Moreover, the so-called exhaustion-of-administrative-remedies rule is a discretionary and not a jurisdictional rule. *See generally Abbott v. Burke*, 100 *N.J.* 269, 297–98, 495 *A.2d* 376 (1985) and *Garrow v. Elizabeth General Hospital and Dispensary*, 79 *N.J.* 549, 561–62, 401 *A.2d* 533 (1979), and cases cited therein. We see no merit to the State's contention in this regard. *R.* 2:11–3(e)(1)(E). Moreover, the State does not challenge the appealability of the Board's order pursuant to *R.* 2:2–3.[6]

The order appealed from is vacated, and the matter is remanded to the Camden County Board of Social Services for further action consistent with this opinion. The State is enjoined from applying the twelve-month consecutive residency requirement of *N.J.S.A.* 44:10–46 to limit cash assistance to otherwise eligible residents.

---

[6] When plaintiff withdrew her application for emergent relief, we ordered the matter placed on our regular calendar.